590 F.2d 554
 100 L.R.R.M. (BNA) 2320, 85 Lab.Cas. P 11,024
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
BALTIMORE NEWS AMERICAN DIVISION, the Hearst Corporation, Respondent,
Baltimore Typographical Union No. 12, Intervenor.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
A. S. ABELL COMPANY, Respondent,
Baltimore Typographical Union No. 12, Intervenor.
 Nos. 77-2389, 77-2482.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 14, 1978.
Decided Jan. 9, 1979.
 
 Barbara G. Gehring, Atty., N. L. R. B., Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Elinor Hadley Stillman, Atty., N. L. R. B., Washington, D. C., on brief), for petitioner in both cases.
 James J. Doyle, Jr., Iowa City, Iowa, for respondent in 77-2389.
 Bernard W. Ruberstein, Carl S. Yaller, Edelman, Levy & Ruberstein, P. A., Baltimore, Md., on brief, for intervenor Baltimore Typographical Union No. 12.
 Bernard W. Ruberstein, Baltimore, Md. (Carl S. Yaller, Edelman, Levy, Ruberstein, P. A., Baltimore, Md., on brief), for intervenor in 77-2482.
 Gil A. Abramson, Baltimore, Md. (James P. Garland, Steven D. Frenkil, Semmes, Bowen & Semmes, Baltimore, Md., on brief), for respondent in 77-2482.
 Before RUSSELL, Circuit Judge, FIELD, Senior Circuit Judge, and HALL, Circuit Judge.
 FIELD, Senior Circuit Judge:
 
 
 1
 In these proceedings the National Labor Relations Board (Board) pursuant to Section 10(e) of the National Labor Relations Act, as amended, (Act), 29 U.S.C. §§ 151, Et seq., has applied for enforcement of its orders against The A. S. Abell Company, Inc., (Abell) and Baltimore News American Division, The Hearst Corporation, (Hearst) issued on June 8, 1977, and June 14, 1977, respectively. In each case the Board found that the respondent had violated Section 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5) and (1), by dealing directly with their employees concerning pension and retirement benefits and by paying them pension and retirement benefits in excess of those provided for in their collective bargaining agreements with Baltimore Typographical Union No. 12 (Union).
 
 
 2
 Abell, a Maryland corporation, publishes daily and Sunday newspapers in the City of Baltimore and was party to a collective bargaining agreement with the Union covering the period from January 1, 1974, to December 31, 1976. Section 23 of the contract guaranteed life-time employment to 361 composing room employees, all members of the Union. Section 23 also provided for an early retirement plan which was available to these employees. Under this plan employees who had at least five consecutive years of full-time service and had attained the age of sixty-two could retire before age 65 and, in addition to benefits accrued under other existing retirement plans, could receive at their option either certain specified monthly benefits or a lump sum payment. Section 24 of the agreement provided for a jointly administered Pension Trust Fund to assure additional retirement benefits to all employees covered by the contract. The provision specified the amounts to be contributed by Abell to the fund but not the specific amounts to which each retiree would be entitled.
 
 
 3
 In May of 1976, Abell found that too few employees had taken advantage of the early retirement option to avoid an overstaffing problem in the composing room. To alleviate the situation, Abell prepared a written plan called "Voluntary Employment Termination Incentive Payment Options" which provided that life-time employees would receive a certain sum of money if they saw fit to voluntarily retire or resign before attaining age 65 as of July 1, 1976. The Plan offered various options depending upon the age of the employee. A similar plan had been presented by Abell in 1975 and had not been objected to by the Union. Twelve employees had taken advantage of Abell's offer under the 1975 plan and terminated their employment.
 
 
 4
 The 1976 Plan was presented to the Union officers on May 18, 1976, who advised Abell that they were very much opposed to it, and shortly thereafter the Union advised Abell by letter that it considered the proposed Plan to be a negotiable item. Subsequently, negotiations between the parties reached an impasse and on May 24th Abell posted a notice in the composing room which informed all employees of the Plan. On the same day the Union posted a notice advising its members that the Plan was considered by it to be an unfair labor practice and that charges were being filed with the National Labor Relations Board. Within the next several months, fifty-four employees applied for voluntary termination and thirty-eight actually terminated their employment on the terms offered in the Plan.
 
 
 5
 Hearst, a Delaware corporation, publishes daily and Sunday newspapers in Baltimore, and was also party to a collective bargaining agreement with the Union covering the period from January 1, 1974, to December 31, 1976. The terms of its collective bargaining agreement were substantially the same as those contained in the agreement between the Union and Abell. Section 23 of the Hearst agreement guaranteed life-time employment to 134 composing room employees, all of whom were members of the Union. Like the Abell Plan, section 23 provided for early retirement and section 24 provided for a Pension Trust Fund with benefits similar to those in the Abell agreement. In May of 1976, Hearst was confronted with an overstaffing problem in the composing room similar to that of Abell and prepared a Plan which was also entitled "Voluntary Employment Termination Incentive Payment Options." The Hearst Plan was practically identical to that which had been proposed by Abell and provided for various lump sum payments to life-time employees depending upon their age. Hearst had also presented a similar plan in 1975 which had not been opposed by the Union.
 
 
 6
 The Hearst Plan was presented to the Union officers on May 20, 1976, and in the course of discussions beginning on that date and continuing thereafter, the Union advised Hearst that it considered the Plan to be a negotiable item and that the Union was basically opposed to it. On July 1, 1976, the company posted a notice in the composing room advising employees of its offer under the Plan, and the Union posted a notice advising its members not to accept the Plan and informed them that it intended to file charges with the National Labor Relations Board. Between July 1, 1976, and August 5, 1976, thirteen of Hearst's employees, all under the age of sixty, accepted the proposal and terminated their employment.
 
 
 7
 Observing that retirement and pension benefits were conditions of employment within the meaning of the Act and therefore mandatory subjects of collective bargaining, the Administrative Law Judge concluded that the provisions for such benefits which had been included in the collective bargaining agreement could not thereafter be modified by the employers, either unilaterally or by negotiations with the employees individually, without the approval of their bargaining agent. Accordingly, he held that in dealing directly with their employees under the 1976 Plans, Abell and Hearst had violated Section 8(d) of the Act and engaged in unfair labor practices within the meaning of Section 8(a)(1) and (5). These findings and conclusions of the Administrative Law Judge were affirmed by the Board in each case, and in our opinion they were supported by substantial evidence in the record and accord with the law. See Allied Chemical Workers v. Pittsburgh Glass, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971); N.L.R.B. v. Scam Instrument Corporation, 394 F.2d 884 (7 Cir. 1968).
 
 
 8
 In fashioning a proposed remedy, the Administrative Law Judge held that the employees of the respondents who were induced to leave their jobs should be offered an opportunity to return to work should they so desire, but that they were also free to remain in permanent retirement if such was their wish. He further held that any employee who elected to return to work should be paid for wages which he otherwise would have earned, subject to a deduction for any interim earnings. In this regard, he concluded that the measure of interim earnings would include the payments made to any employee by the respondents in the form of preferred benefits under the 1976 Plan, including any single or lump sum payments. However, in his proposed order which was adopted by the Board, he failed to address the issue of interim earnings and benefits in any definitive fashion. We agree with the conclusion reached by the Administrative Law Judge on this point, but in our opinion the order should be amended to specifically provide that payments made under the 1976 Plan shall be included in the measure of interim earnings of any employee who elects to return to work, and in the event that the aggregate of such benefits and payments exceeds the back wages due to an employee, repayment of the excess shall be a condition to reinstatement.
 
 
 9
 Accordingly, these cases are remanded to the Board with directions to amend the orders in accordance with this opinion and the orders, as amended, shall be enforced.