Richard A. ZSCHUNKE, et al., Plaintiffs,

v.

**BELL ATLANTIC CORPORATION, et al., Defendants.**

No. 93–3326.

United States District Court, E.D. Pennsylvania.

Jan. 18, 1995.

Ronald L. Wolf, Martina Walsh McLaughlin, Litvin, Blumberg, Matusow & Young, Philadelphia, PA, for plaintiffs.

Francis M. Milone, Michael L. Banks, Joseph B.G. Fay, Morgan, Lewis & Bockius, Philadelphia, PA, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KATZ, District Judge.

After a bench trial on the issue of liability,[1] the court makes the following findings of fact and conclusions of law:

*Findings of Fact*

1. The plaintiffs are five former employees of Bell Telephone Company of Pennsylvania ("Bell of Pennsylvania") and New Jersey Bell Telephone Company ("New Jersey Bell") who voluntarily retired between April 3 and June 1, 1991.

2. At all relevant times, Bell of Pennsylvania and New Jersey Bell were subsidiaries of Bell Atlantic Corporation ("Bell Atlantic").

3. All five plaintiffs are participants in the Bell Atlantic Management Pension Plan (the "Pension Plan").

4. The defendants are Bell Atlantic, the Pension Plan, and Charles W. Crist, the Vice President of Human Resources at Bell Atlantic.

5. Soon after Bell Atlantic's formation in 1984, senior management recognized that Bell Atlantic and its subsidiaries employed more managers than the business would require in the long term, and that some downsizing would be necessary. (Crist Test., Tr. II at 109–10.)

6. There are several methods that can be used to achieve corporate downsizing goals, including: (1) pension benefit retirement incentives, (2) severance pay retirement incentives, (3) attrition, (4) strict controls on hiring and promotion, and/or (5) involuntary terminations.

---

1. The trial was bifurcated by an order dated November 25, 1994. The court heard live testimony on November 29 and 30, 1994. Thereafter, the parties submitted designated deposition testimony and post-trial briefs.

7. Prior to August 13, 1991, Bell Atlantic had never used involuntary terminations to reach its downsizing goals. It had offered pension benefit retirement incentives in 1985 and 1988. It had also offered severance pay retirement incentives or Force Management Plans ("FMPs") to certain groups of managers at various times, including February and May 1991. (Stip. ¶ 2–4; Trial Exs. 66, 71, 73, 74.)

8. On August 13, 1991, Bell Atlantic's Board of Directors, through its Human Resources Committee, amended the Pension Plan (the "1991 Amendment"). The 1991 Amendment was prospective, applying only to participants who retired from active employment on or after December 15, 1991. It made some permanent improvements in Pension Plan benefits, and improved the benefits available to participants who elected to retire during a specified window of time, thereby providing an incentive for voluntary retirement. (Stip. ¶ 1; Trial Ex. 40.)

9. The plaintiffs allege that the defendants were seriously considering improvements to the Pension Plan before they retired, but concealed that information from them. In their amended complaint, they assert claims for violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B), 1140; breach of fiduciary duty; and equitable estoppel. (Am. Compl. ¶¶ 51–64.)

10. In August 1990, Bell Atlantic and its subsidiaries employed between 20,000 and 21,000 persons in management positions. (Stip. ¶ 4.)

11. On August 8, 1990, Anton Campanella, the President of Bell Atlantic, and Phillip Campbell, the Chief Financial Officer, sent a memorandum to officers of Bell Atlantic and its operating companies. The memorandum read:

The slowdown in the economy and the related business downturn are major considerations for our business.... [W]e will all need to reexamine the level of expense planned for the rest of this year and into 1991....

In addition to looking at the many ways we will reduce expense, we are asking you to establish new management and non-management force objectives for the end of 1990 and 1991.... [W]ith the changing economic conditions, we need to find ways to reduce those numbers.

The Office of the Chairman has asked John Gamba [the Executive Vice President of Bell Atlantic's Network Services Staff] to work with you to coordinate this effort. He will be asking you to rethink the need for any additions to management through hires and promotions, to look for ways to expedite consolidations of work groups and for ways to eliminate unnecessary work. He will also develop end of year targets for each year through 1993 to help us focus on our goal of reaching 18,000 management employees by that time frame....

(Trial Ex. 75.)

12. On the same date, Mr. Gamba sent a memorandum to officers of Bell Atlantic and its operating companies that read:

.... Our challenge today is to find ways to reduce [the number of management employees] and still fulfill our business commitments.

We need to stop the growth in management employees as soon as possible. For that reason I have asked the HR Directors to review with you all open management requisitions to determine whether they can be deferred, especially those that would result in net additions, such as hires or promotions into management.

.... I ask you to consider all possible ways that your entity can reduce its force requirements through consolidation of work activities, mechanization or elimination of work. Charlie Crist and I will be in touch with you to help develop approaches that establish appropriate force goals and action plans that meet our Bell Atlantic commitments.

(Trial Ex. 76.)

13. On October 25, 1990, Mr. Crist sent a memorandum to the officers and directors of Bell Atlantic and its operating companies. The stated purpose of the memorandum was to provide a suggested response to possible inquiries from employees about "whether Bell Atlantic is planning another downsizing

incentive program for management, such as a Force Management Program (FMP) offer or a special pension 'window'." The suggested response was:

> Based on our current knowledge of business conditions, we do not anticipate nor are we planning for any general incentive programs, i.e., ones available to a wide portion of the employee body. We do have a program available, the Force Management Program, that could be activated should a significant need arise ...

(Trial Ex. 79.) This statement was true at the time it was made.

14. In early 1991, Bell Atlantic did not know the extent of the management surplus, or where the surplus was located. (Crist Test., Tr. II at 118.) To help answer those questions with respect to its staff operations, Bell Atlantic retained the MAC Group, a consulting firm, in February 1991. (Crist Test., Tr. II at 112, 119.) In order to identify the number and location of excess managers in the operating telephone companies, Bell Atlantic formed an Organizational Effectiveness Task Force (the "OETF") in mid-May 1991. (Crist Test., Tr. II at 113, 119–20.)

15. In early or mid-April 1991, Mr. Crist requested Linda Spear, the Director of Benefits Planning for Human Resources, to identify possible methods for downsizing the management work force. (Stip. ¶ 5.)

16. In response to Mr. Crist's request, Ms. Spear prepared the "Strawman" White Paper, dated April 17, 1991. The White Paper compared and contrasted severance pay retirement incentives with pension benefit retirement incentives, and summarized the methods that Bell Atlantic had used to downsize its management work force in the past. It recommended the use of an FMP severance pay retirement incentive if there were "discreet areas of the business where excess positions can be identified and quantified" and "a need to control 'who' and 'how many' accept the offer"; but a pension benefit retirement incentive if there were "a pervasive need for downsizing," "an overall need to increase span of control," "a need to downsize a significant number of positions," and "no need to control 'who' and 'how many' accept the offer." These conclusions were based on several "working assumptions," including: (1) the management work force would be decreased by approximately 1500 people, (2) involuntary terminations would be avoided, and (3) the downsizing would occur in 1991. (Trial Ex. 66.)

17. The "Strawman" White Paper generated discussion among various individuals in Bell Atlantic's Human Resources and Legal departments. (Stip. ¶ 7; *see* Trial Exs. 67–70.)

18. On April 26, 1991, Ms. Spear sent a memorandum entitled "Involuntary Downsizing or Reductions in Force" to Mr. Crist via electronic mail. (Trial Ex. 71.) This document was prepared at the request of Mr. Crist, who considered involuntary terminations "a very legitimate means of downsizing" at that time. (Crist Test., Tr. II at 117.)

19. In April 1991, Mr. Crist asked Carol Burger, Treasurer of Bell Atlantic, to analyze the costs that would be associated with any potential pension plan retirement incentive. Ms. Burger promptly requested Joseph Bobrowski, the Executive Director of Benefits Finance, to research the issue. (Stip. ¶ 8.)

20. Mr. Bobrowski contacted Thomas Bainbridge of Actuarial Sciences Associates ("ASA"), which Bell Atlantic had used periodically in a consulting capacity, and asked him to provide an analysis of the kinds of incentives that might induce 800, 1,600 or 2,400 retirements. (Stip. ¶ 9.)

21. Mr. Bainbridge reported back to Mr. Bobrowski and identified several alternatives within the parameters provided by Mr. Bobrowski. Mr. Bobrowski summarized the information and reported it to Mrs. Burger in a memorandum dated April 29, 1991. (Stip. ¶ 10; Trial Exs. 64, 65.)

22. In April and May 1991, Bell Atlantic incurred approximately $76,000 in consulting fees for work done by ASA. (Stip. ¶ 11; Trial Ex. 57.)

23. On April 26, 1991, Barry Peters, an attorney in Bell Atlantic's Legal department, was asked whether he thought the series of questions and answers accompanying the May 1991 FMP should address the possibility of future pension benefit retirement incen-

tives. Before answering this question, Mr. Peters asked Ms. Spear about "the status of any studies related to potential downsizing this year." Ms. Spear responded:

[W]e are NOT close to seriously considering a major downsizing at this time for the near future. In other words, my sense is that we are very unclear whether we should even be considering a major offer this year.

Mr. Peters concluded that "[u]nder that state of facts, there is some legal support for saying nothing at this time." His advice, however, was to address the issue. Mr. Peters noted that the decision involved "a weighing of business objectives and legal risks." (Trial Ex. PL–61.)

24. The MAC Group began to report its conclusions to Bell Atlantic in late May or early June 1991. (Crist Test., Tr. II at 119.)

25. In June 1991, Mr. Bobrowski asked the Pension Plan's enrolled actuaries, Towers, Perrin, Forster & Crosby ("TPF & C"), to develop cost and benefit estimates for various pension benefit retirement incentive alternatives. TPF & C provided the requested information in late June 1991. (Stip. ¶ 12.)

26. On June 27, 1991, Mr. Bobrowski met with representatives from the Human Resources department to discuss the development of a proposal for presentation to their respective superiors: James Dickerson, who had replaced Ms. Burger as Treasurer, and Mr. Crist. (Stip. ¶ 13.)

27. Mr. Bobrowski and representatives from the Human Resources department met periodically through early July, developing and refining a detailed proposal for a pension benefit retirement incentive. They finally presented their proposal, and TPF & C's cost projections, to Mr. Crist and Mr. Dickerson in mid-July 1991. (Stip. ¶ 14.)

28. On July 12, 1991, the OETF issued a report which recommended downsizing the management work force by 1,940. The OETF report targeted particular areas for reductions, but was silent as to how the cuts should be made. An "action plan" attached to the report gave Mr. Crist responsibility for developing a plan by August, and for making the recommended reductions by the end of the year. (Trial Ex. 54.)

29. On July 31, 1991, Mr. Crist and Mr. Dickerson presented the proposal that had been prepared by their staffs to the Office of the Chairman (the "OOC"), which consisted of Bell Atlantic's Chief Executive Officer, President, Chief Financial Officer and other senior officers; and the Network Policy Council (the "NPC"), which consisted of presidents and various other executives from the Bell Atlantic operating telephone companies. (Stip. ¶ 15.) The OOC and NPC requested that certain features of the proposal be modified. (Stip. ¶ 16; Trial Ex. 46.)

30. The OOC and NPC were responsible for determining whether to recommend a proposal to the Board of Directors for a decision. (Stip. ¶ 15.)

31. Bell Atlantic's Board of Directors had delegated its exclusive authority to approve or reject an amendment to the Pension Plan to the Human Resources Committee. (Stip. ¶ 17.)

32. Mr. Crist and Mr. Campanella met with John Marous, Chairman of the Human Resources Committee, to review the revised proposal on August 8, 1991. At that meeting, they decided to present the revised proposal to the Human Resources Committee. (Stip. ¶¶ 17–18.)

33. The Human Resources Committee approved the revised proposal on August 13, 1991. The 1991 Amendment was announced to employees the following day. (Stip. ¶ 18; Trial Ex. 42.)

34. Plaintiff John W. McCallion, Jr.'s retirement from Bell of Pennsylvania became effective April 3, 1991, when he was 55. He had applied for a pension on January 28, 1991. (Stip. ¶ 22; Trial Ex. 24.) In December 1990 and again in February 1991, Mr. McCallion asked his immediate supervisor, Mr. McFadden, whether there would be any future retirement incentives. In December, Mr. McFadden showed Mr. McCallion the October 25, 1990 memorandum from Mr. Crist. In February, Mr. McFadden told Mr. McCallion that no retirement incentives were in the works. Mr. McCallion never contacted the benefits office or anyone higher than

Mr. McFadden in the corporate structure to inquire about possible retirement incentives. (*McCallion* Test., Tr. II at 3, 8, 11–12.)

35. Plaintiff George A. Richardson, Jr.'s retirement from Bell of Pennsylvania became effective April 19, 1991, when he was 57. He had applied for a pension on December 27, 1990. (Stip. ¶ 23; Trial Ex. 18.) In December 1990 and again in late March or early April 1991, Mr. Richardson asked his immediate supervisor, Mr. Feeney, whether any retirement incentives were being planned. On each occasion, Mr. Feeney said he had no knowledge of any such plans. Mr. Richardson never contacted the benefits office or anyone higher than Mr. Feeney in the corporate structure to inquire about future retirement incentives. (Richardson Test., Tr. I at 168, 174–79.)

36. Plaintiff Richard A. Zschunke's retirement from Bell of Pennsylvania became effective May 1, 1991, when he was 57. He had applied for a pension on January 16, 1991. (Stip. ¶ 20; Trial Ex. 3.) Before he retired, Mr. Zschunke asked several of his supervisors whether Bell Atlantic was planning any retirement incentives. Each supervisor said that he was unaware of any such plans. Mr. Zschunke never contacted the benefits office to inquire about future retirement incentives. (Zschunke Test., Tr. I at 149–51.)

37. Plaintiff Harry E. Mulholland's retirement from Bell of Pennsylvania became effective May 13, 1991, when he was 59. He had applied for a pension on January 29, 1991. (Stip. ¶ 21; Trial Ex. 29.) Between January and May 13, 1991, Mr. Mulholland had conversations with supervisors and several other individuals regarding the possibility of future retirement incentives. On each occasion, he was informed that no such incentives were forthcoming. (Mulholland Test., Tr. I at 184–200.)

38. Plaintiff Harry Bingenheimer's retirement from New Jersey Bell became effective June 1, 1991, when he was 55. He had applied for a pension on March 28, 1991. (Stip. ¶ 24; Trial Ex. 35.) Mr. Bingenheimer discussed the possibility of future retirement incentives with Mr. Vogl, the Director of Installation and Maintenance in the Atlantic City District, in late April or early May 1991. Mr. Bingenheimer never contacted the benefits office or anyone higher than Mr. Vogl in the corporate structure to inquire about future retirement incentives. (Bingenheimer Test., Tr. II at 30; Vogl Test., Tr. II at 145; Trial Ex. 63.)

39. The plaintiffs would have delayed their retirements if they had known that Bell Atlantic would announce a pension benefit retirement incentive in August 1991.

40. The plaintiffs' retirements preceded serious consideration of the 1991 Amendment.

41. Bell Atlantic first gave serious consideration to the 1991 Amendment in mid-July 1991. Before that time, Bell Atlantic lacked information as to how many management positions needed to be cut and where those cuts could be made without adversely impacting services. Bell Atlantic could not seriously consider whether to use a pension benefit retirement incentive to downsize its management work force until it knew the size and location of the management surplus.

42. Bell Atlantic first became aware of the size and location of the surplus in the operating telephone companies on July 12, 1991, when the OETF report was released.

43. The mid-July presentation to Mr. Crist and Mr. Dickerson by members of their staffs marked the first time that a pension benefit retirement incentive was being seriously discussed for implementation by those in authority to implement such changes.

44. Mr. Crist's testimony that he did not give serious consideration to a pension benefit retirement incentive until mid-July 1991 is credible. (Crist Test., Tr. II at 122–25; Trial Ex. 54.)

45. Prior to July 1991, members of the Human Resources, Finance and Legal departments engaged in preliminary research and discussion about various alternative methods for downsizing so that Bell Atlantic could act quickly when the size and location of the management surplus were ascertained. Although pension benefit retirement incentives were mentioned as one possible alternative, they were not then under serious consideration. As those at the decision-making level recognized, no possible solution to the surplus management problem would be ripe

for serious consideration until after the preliminary work was completed, and the results of the studies by the MAC Group and the OETF were received.

46. Neither the October 25, 1990 memorandum from Mr. Crist nor any other communication to the plaintiffs concerning possible retirement incentives constituted an affirmative misrepresentation, much less a material one.

47. The plaintiffs have failed to prove a material misrepresentation, reasonable and detrimental reliance upon the misrepresentation, or any extraordinary circumstances justifying the use of equitable estoppel.

48. The defendants did not intentionally conceal information about a possible amendment to the Pension Plan from the plaintiffs for the purpose of inducing them to retire before such an amendment was adopted.

*Conclusions of Law*

1. This court has jurisdiction under 29 U.S.C. §§ 1132(e)(1), 1140 and 28 U.S.C. § 1331.

2. Venue is proper under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b).

3. The Pension Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A).

4. Bell Atlantic is the "administrator" of the Pension Plan and the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16).

5. As plan administrator, Bell Atlantic is a fiduciary and is required to "discharge [its] duties ... solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a).

■ 6. A plan administrator breaches its fiduciary obligations by making affirmative material misrepresentations to plan participants about changes to an employee pension benefit plan. *Fischer v. Philadelphia Elec. Co.,* 994 F.2d 130, 135 (3d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 622, 126 L.Ed.2d 586 (1993).

■ 7. A plan administrator may not circumvent its fiduciary obligations "by building a 'Chinese wall' around those employees on whom plan participants reasonably rely for important information and guidance about retirement." *Fischer,* 994 F.2d at 135.

■ 8. ERISA does not impose a "duty of clairvoyance" on fiduciaries. *Fischer,* 994 F.2d at 135. "An ERISA fiduciary is under no obligation to offer precise predictions about future changes to its plan. Rather, its obligation is to answer participants' questions forthrightly, 'a duty that does not require the fiduciary to disclose its internal deliberations nor interfere with the substantive aspects of the [collective] bargaining process.'" *Id.* (citations omitted).

■ 9. Whether a communication to a pension plan participant constitutes an affirmative misrepresentation is a question of fact. *Fischer,* 994 F.2d at 135.

■ 10. Whether an affirmative misrepresentation is material is a mixed question of law and fact. *Fischer,* 994 F.2d at 135. A misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision about if and when to retire. *Id.* The seriousness with which a possible amendment is being considered at the time the misrepresentation is made is a factor in the overall materiality inquiry. *Id.* All else being equal, the more seriously a plan change is being considered, the more likely it is that a misrepresentation will pass the threshold of materiality. *Id.*

■ 11. "Serious consideration" cannot be tied to a single objective event. *Kurz v. Philadelphia Elec. Co.,* 994 F.2d 136, 139 (3d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 622, 126 L.Ed.2d 586 (1993).

■ 12. Bell Atlantic did not breach any fiduciary duty owed to the plaintiffs, since it made no affirmative misrepresentations to the plaintiffs about forthcoming changes in pension benefits at a time when such changes were under serious consideration. *See Fischer,* 994 F.2d at 135.

■ 13. To establish a claim for equitable estoppel under ERISA, a plaintiff must prove: (1) a material representation, (2) reasonable and detrimental reliance upon the representation; and (3) extraordinary circumstances. *Curcio v. John Hancock Mutual Life Ins. Co.,* 33 F.3d 226, 235 (3d Cir. 1994.) The determination of an equitable estoppel claim is a mixed question of law and

fact. *Id.* at 236. Since the plaintiffs have failed to prove any of the elements of equitable estoppel, they are not entitled to recover under that theory.

14. Section 510 of ERISA makes it "unlawful for any person ... to discriminate against a participant ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the Plan, this subchapter, or the Welfare and Pension Plans Disclosure Act." 29 U.S.C. § 1140. Because the court has found that the defendants did not engage in any prohibited conduct for the purpose of inducing the plaintiffs to retire before the adoption of the 1991 Amendment, the plaintiffs cannot prevail on their Section 510 claim. *See Gavalik v. Continental Can Co.,* 812 F.2d 834, 852 (3d Cir.), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987).

15. In light of the previous conclusions, the plaintiffs are not entitled to recover benefits to which they would have been entitled if they had retired on or after December 15, 1991, the effective date of the 1991 Amendment.