

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-1-1996

# Fischer v. Phila Elec Co

Precedential or Non-Precedential:

Docket 95-1793,95-1794

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

## Recommended Citation

"Fischer v. Phila Elec Co" (1996). *1996 Decisions.* Paper 35.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/35

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


Nos. 95-1793 and 95-1794


HERBERT L. FISCHER; FLOYD L. ADAMS; JAMES W. ALFREDS;
JOHN I. ARENA; EARL T. ATKINSON; WILLIAM AUVE; THOMAS
F. BECK; WILLIAM J. BONO; WILLIAM A. BURWELL, JR.,
JOSEPH C. CALABRESE; PETER CARFAGNO; JOHN B. CREIGHTON;
RALPH J. DAFERMO, SR.; FELIX A. DEJOSEPH; JOSEPH A. DEVITO;
JOHN T. DOUGHERTY; JOHN J. DOWLING; ANTHONY FALASCA;
EUGENE FINK; RITA J. GESUALDO; EDWIN HAINES; JOSEPH T. HALEY;
DANIEL J. HEFFERAN; LEO M. HILL; ROBERT J. HOOPES;
DONALD J. HOY; MICHAEL HRYNKO; DONALD HUGHES; CARL M. HUNSICKER;
NEAL IRELAND; WALTER D. KRAUS; CHARLES E. LINDEMUTH; ROBERT
F. MAHONEY; ANTHONY D. MARCHESANI; ROBERT P.F. MCCARON;
ROBERT MCCORMICK; FRANK L. MERCADANTE; JOHN P. MONAGHAN;
DAVID MONZO; JOHN K. MOORE; JOSEPH P. MORAN; MILDRED PEARL
MORGAN; RALPH E. MOYER; HERBERT E. MUELLER; JAMES J. NUGENT;
THOMAS E. OETZEL; FRANK W. PERSICHETTI, SR.; CHARLES W.
PLUMMER; LEWIS RAIBLEY; JAMES J. RODDY; JOHN J. SAUNDERS;
LOUIS F. SAUNDERS; NICHOLAS J. SCRENCI; JOSEPH J.
SEMETTI; JOHN STEINDL; WILLIAM F. THOMPSON; MICHAEL W.
TRENDLER; FRANCIS R. TUNNEY, SR.; HERBERT R. WALTERS;
RICHARD S. WILSON; JOHN H. ZIMMER; GERALD A. ZIMMERMAN

v.

PHILADELPHIA ELECTRIC COMPANY; JOSEPH F. PAQUETTE, JR.;
MICHAEL J. CROMMIE; SERVICE ANNUITY PLAN OF PHILADELPHIA
ELECTRIC COMPANY

HERBERT L. FISCHER, JOHN B. CREIGHTON, FRANCIS R. TUNNEY, SR.;
EARL ATKINSON, LEO M. HILL, DONALD HUGHES; JOSEPH P. MORAN;
MICHAEL W. TRENDLER; JOHN H. ZIMMER; WILLIAM AUVE;
JOHN STEINDL; LOUIS F. SAUNDERS; ROBERT MCCORMICK;
WILLIAM J. BONO; JAMES J. RODDY; RITA J. GESUALDO; RALPH J.
DAFERMO, SR.; JOSEPH C. CALABRESE; JAMES W. ALFREDS;
FELIX A. DEJOSEPH; EUGENE FINK; JOSEPH T. HALEY;
WALTER D. KRAUS; CHARLES W. PLUMMER; ROBERT P.F. MCCARRON;
RICHARD S. WILSON; JOHN P. MONAGHAN, RALPH E. MOYER; JOHN J.
DOWLING; JOSEPH J. SEMETTI; CHARLES E. LINDEMUTH; ROBERT F.
MAHONEY; JOHN K. MOORE; JAMES J. NUGENT; JOHN J. SAUNDERS;
ANTHONY FALASCA; DANIEL J. HEFFEREN; NICHOLAS J.
SCRENCI; THOMAS E. OETZEL; DONALD J. HOY; FLOYD L.
ADAMS, THOMAS F. BECK; JOHN T. DOUGHERTY; WILLIAM F.
THOMPSON; GERALD A. ZIMMERMAN; HERBERT E.
MUELLER; HERBERT R. WALTERS; LEWIS RAIBLEY;
JOSEPH L. GIORGIO; JOSEPH DEVITO;

DAVID MONZO; THOMAS J. LEE; THOMAS B. BARNES, JR.;
PHILIP G. MULLIGAN; ROBERT L. TOMLINSON; JOHN R. GRIMES;
W.B. WILLSEY; WILLIAM J. MOSS; JAMES T. PRYOR; ROBERT
J. GLENN; GEORGE C. ZAPP; JOSEPH J. DELLA VECCHIO;
GEORGE V. CHURACH; CHARLES T. REIMEL; ANDREW J.
KELLEHER; GEORGE C. HALL; WILLIAM P. ZACKEY;
FRANCIS W. BATIPPS; HARRY C. FRYMIARE, JR.;
JOSEPH J. GRECO; RICHARD R. ROWLANDS; JESSE P.
BOYD; JAMES D. DENNETT; VERNON C. READMAN, JR.;
JOSEPH L. GIORGIO,; EDWARD M. HAILE; EUGENE C. SCHINDLER;
JOHN P. SWAHL; ELMER E. LUCAS; JAMES L. ROUSH;
JAMES V. LEWIS; ALBERT J. RIEGER; THOMAS J. SHERIDAN, JR.;
DOLORES A. ROMANO; HELEN J. THROCKMORTON; ROBERT E.
SPROSS; WILLIAM P. ROHLFING; EDWARD C. KISTNER, JR.;
HARRY W. BACKHOUSE; JAMES V. MANNION, JR.; JOSEPH E.
BONAPARTE; WILLIAM A. BRADY, JR.; MALCOLM J. MACNEIL;
MANUS J. COONEY; JOHN J. KUHNS; MARLENE BELL; DEAN G. BRADFORD;
JAMES W. BATEMAN; JAMES S. HERRICK; STANLEY W. JACQUES, JR.;
RUDOLPH G. DELLA VECCHIO; ALDEN F. TUCKER & BERNARD J. DRESS,

Appellants in 95-1794

----------------------

HERBERT L. FISCHER; FLOYD L. ADAMS; JAMES W. ALFREDS;
JOHN I. ARENA; EARL T. ATKINSON; WILLIAM AUVE;
THOMAS F. BECK; WILLIAM J. BONO; WILLIAM A. BURWELL, JR.;
JOSEPH C. CALABRESE; PETER CARFAGNO; JOHN B.
CREIGHTON; RALPH J. DAFERMO, SR.; FELIX A.
DEJOSEPH; JOSEPH A. DEVITO; JOHN T. DOUGHERTY;
JOHN J. DOWLING; ANTHONY FALASCA; EUGENE FINK; RITA J.
GESUALDO; EDWIN HAINES; JOSEPH T. HALEY;
DANIEL J. HEFFERAN; LEO M. HILL; ROBERT J. HOOPES;
DONALD J. HOY; MICHAEL HRYNKO; DONALD HUGHES; CARL M.
HUNSICKER; NEAL IRELAND; WALTER D. KRAUS; CHARLES E.
LINDEMLUTH; ROBERT F. MAHONEY; ANTHONY D.
MARCHESANI; ROBERT P.F. MCCARRON; ROBERT MCCORMICK;
FRANK L. MERCANDANTE; JOHN P. MONAGHAN;
DAVID MONZO; JOHN K. MOORE; JOSEPH P. MORAN; MILDRED PEARL
MORGAN; RALPH E. MOYER; HERBERT E. MUELLER; JAMES J. NUGENT;
THOMAS E. OETZEL; FRANK W. PERSICHETTI, SR.;
CHARLES W. PLUMMER; LEWIS RAIBLEY; JAMES J. RODDY;
JOHN J. SAUNDERS; LOUIS F. SAUNDERS; NICHOLAS J. SCRENCI;
JOSEPH J. SEMETTI; JOHN STEINDL; WILLIAM F. THOMPSON;
MICHAEL W. TRENDLER; FRANCIS R. TUNNEY, SR.;
HERBERT R. WALTERS; RICHARD S. WILSON; JOHN H. ZIMMER;
GERALD A. ZIMMERMAN

v.

PHILADELPHIA ELECTRIC COMPANY; JOSEPH F. PAQUETTE, JR.;
MICHAEL J. CROMMIE; SERVICE ANNUITY PLAN OF

PHILADELPHIA ELECTRIC COMPANY

PECO Energy Company, formerly known as
Philadelphia Electric Company, Joseph F.
Paquette, Jr., Michael J. Crommie and
Service Annuity Plan of Philadelphia
Electric Company,

Appellants in 95-1794

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 90-cv-08020)

Argued April 29, 1996

Before:  COWEN and ROTH, Circuit Judges
and CINDRICH, District Judge

(Opinion filed October 1, 1996)

Ronald L. Wolf, Esq.
Martina W. McLaughlin, Esq. (Argued)
Litvin, Blumberg, Matusow & Young
1339 Chestnut Street
The Widener Building, 18th Floor
Philadelphia, PA  19107

        Attorneys for Appellants in 95-1793 and
        Cross-Appellees in 95-1794

David H. Marion, Esq. (Argued in 95-1793 & 1794)
Howard J. Bashman, Esq.
Montgomery, McCracken, Walker & Rhoads
Three Parkway, 20th Floor
Philadelphia, PA  19102

        Attorneys for PECO Energy Co.,
        f/k/a Philadelphia Electric Co.;
        Joseph F. Paquette, Jr.; Michael
        J. Crommie; and Service Annuity
        Plan of Philadelphia Electric
        Company Appellees in 95-1793
        and Cross-Appellants in 95-1794

OPINION OF THE COURT


ROTH, Circuit Judge:


In this appeal, we must review the application of a decision we reached when this case first came before us. In Fischer v. Philadelphia Elec. Co., 994 F.2d 130 (3d Cir.) ("Fischer I"), cert. denied, 510 U.S. 1020 (1993), we reversed the district court's grant of summary judgment to defendant Philadelphia Electric Co. ("PECo"), holding that there were genuine issues of material fact as to whether PECo, acting in its role as fiduciary under the Employee Retirement Income Security Act ("ERISA"), had made affirmative material misrepresentations to its employee-beneficiaries. The misrepresentations alleged were that PECo had denied, or failed to disclose when asked, that it was seriously considering an early retirement program. We remanded the case to the district court to determine when PECo began to give serious consideration to an early retirement program. Id. at 135.

On remand, the district court concluded that PECo was seriously considering an early retirement program as of March 12, 1990. Fischer v. Philadelphia Elec. Co., C.A. No. 90-8020, slip op. at 19 (E.D. Pa. May 16, 1994) ("District Ct. Op."). Applying Fischer I, the district court held that any employee who sought information about retirement benefits during the period from March 12, 1990, until the announcement of the plan on April 19, 1990, and who was told that no change was under consideration, had received material misinformation.

We find that the district court misunderstood the concept of "serious consideration." We will therefore reverse the decision of the district court, and we will enter judgment for defendant.

I.

This action arises out of PECo's efforts to cut costs and reduce its payroll by implementing an early retirement plan. On April 19, 1990, Joseph Paquette, PECo's President and Chief Operating Officer, announced in a letter to all employees that he would recommend to PECo's Board of Directors that the company cut its payroll through early retirement. On April 26, 1990, PECo sent a letter to all employees who had announced an intent to retire, suggesting that they delay their retirement until the company's early retirement package was finalized. On May 25, 1990, PECo's Board of Directors approved a plan, which included inducements such as a five year time-in-service credit, a five year age credit, and severance pay. These events caused much consternation among employees who had retired in the months preceding the plan's announcement.

Various pre-plan retirees filed suit in the U.S.

District Court for the Eastern District of Pennsylvania, alleging that PECo had long known of its intent to offer an early retirement package, or at least that it was considering a package, and had breached its fiduciary duty under ERISA § 404, 29 U.S.C. § 1104, by providing material misinformation. The district court certified a class, then entered summary judgment for PECo. In Fischer I, we reversed, holding that PECo could be liable for breach of fiduciary duty if the company represented that no early retirement plan was being considered at a time when the plan was in fact under serious consideration. 944 F.2d at 133. We remanded for a trial on the merits; a bench trial followed. The facts we recite here were found by the district court; the vast majority were stipulated.

PECo had long engaged in a practice of reviewing its retirement and pension benefits packages as part of its ordinary course of business. During one such review, on March 21, 1988, Fred Beaver, an Administrative Assistant in the Benefits Division of Human Resources, prepared a memorandum for Charles Fritz, Vice President of Personnel and Industry Relations, on the possibility of reducing the size of PECo's work force. The memorandum suggested that a modest "sweetener" could induce approximately 50% of a target group of workers to retire. During the same period, on May 5, 1988, Michael Crommie, PECo's Director of Benefits, contacted William Murdoch, a consultant with Towers, Perrin, Forster & Crosby ("TPF&C"), to discuss various early retirement options. Discussions between management and TPF&C continued into June.

Beaver's memorandum and the TPF&C consultations occurred roughly contemporaneously with Joseph Paquette's arrival at PECo as president and chief of operations. Paquette had a long term goal of reducing the number of PECo employees, and he would ultimately recommend the 1990 early retirement package. In June, 1988, however, Paquette decided against an early retirement plan. At trial, Paquette testified that PECo was then in the process of completing one nuclear plant and restarting another. He did not want to risk an early retirement program because personnel vital to the nuclear effort might leave. He believed that PECo could not legally institute an early retirement plan that excluded nuclear plant personnel. After deciding that no early retirement package would be considered, Paquette shifted his attention to promoting operational excellence at the company.

In July, 1989, PECo requested a rate increase from the Public Utility Commission ("PUC"). PUC staff made a preliminary recommendation that PECo be granted less than half its requested increase.

In November, 1989, as part of the operational excellence program, PECo hired McKinsey & Co. to explore long-term strategies and cost-cutting measures. Paquette used the McKinsey report to calculate the savings that an early retirement program could produce.

On December 13, 1989, Paquette held three meetings with employees to discuss the importance of the rate increase to the company. In response to questions, Paquette stated that an early retirement plan might be considered if the rate request was

denied.  He explained that the company had no plans for such a program because the outcome of the rate increase was in doubt.  Paquette stated that PECo's first option in the event the increase was denied would be to appeal the decision but that the company would also consider cutting costs and reducing its stock dividend.  On March 1, 1990, an Administrative Law Judge issued an interim decision recommending that PECo receive 21% of the rate increase it had requested.

Events accelerated rapidly following the ALJ's decision.  On March 12, 1990, Kenneth Lefkowitz, Manager of Compensation & Benefits, contacted Murdoch at TPF&C.  Lefkowitz stated PECo's concern about its rate case before the PUC and the need to reduce costs quickly.  The question of an early retirement sweetener was mentioned as a possible method.  TPF&C had done no work for PECo on early retirement plans since June, 1988, nor had TPF&C been asked to prepare contingency plans in case PECo's rate request was denied.  On March 20, 1990, Lefkowitz asked TPF&C to develop a set of early retirement alternatives.  On March 28, 1990, Murdoch proposed three alternative programs, the first of which resembled the 1988 program in some respects, although it targeted a different group of eligible employees and contained different severance provisions.  On April 2, 5, and 6, Murdoch had further discussions with PECo personnel about the details of the early retirement sweetener.  On April 7, senior PECo executives attended a corporate strategy meeting.  Notes from the meeting indicated a statement by Paquette that on April 20 he would issue a letter announcing a $100 million cost cutting program.  On April 13, 1990, TPF&C provided PECo with a survey of early retirement plans used by other utilities.  On April 19, 1990, the PUC granted less than 50% of PECo's rate request.  Paquette then sent the letter to PECo employees announcing his intent to recommend an early retirement package.

Based on these findings, the district court held that PECo began seriously considering an early retirement plan on March 12, 1990.  The district court entered judgment for those retirees who asked about an early retirement plan and retired after March 12.  It entered judgment for PECo on the claims of those retirees who asked about retirement and retired before that date.  Both PECo and the plaintiff class appealed.  The plaintiff class appeals the district court's determination that serious consideration of the early retirement plan did not begin before March 12, 1990.  PECo, on the other hand, asserts that serious consideration did not begin until after March 12, 1990.

II.

Our analysis proceeds within the confines of Fischer I.  In that decision, we established the general rule that governs interactions between a company-as-fiduciary and its employee-beneficiaries regarding changes in benefits:  "A plan administrator may not make affirmative material misrepresentations to plan participants about changes to an employee pension benefits plan.  Put simply, when a plan administrator speaks, it must speak truthfully."  994 F.2d at 135.  This overarching duty of truthfulness forms an important

part of our ERISA jurisprudence.  See In re Unisys Corp. Retiree Medical Benefit "ERISA" Litig., 57 F.3d 1255, 1266-67 (3d Cir. 1995), cert. denied, ___ U.S. ___, 116 S.Ct. 1316 (1996); Bixler v. Central Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1302-03 (3d Cir. 1994).

The rule of truthfulness that we announced in Fischer Ifocused on the materiality of a plan administrator's misrepresentations.  We defined materiality as a mixed question of law and fact, ultimately turning on whether "there is a substantial likelihood that [the misrepresentation] would mislead a reasonable employee in making an adequately informed decision about if and when to retire."  Id. at 135.  We further explained that

> [i]ncluded within the overall materiality inquiry will
> be an inquiry into the seriousness with which a
> particular change to an employee pension plan is being
> considered at the time the misrepresentation is made.
> All else equal, the more seriously a plan change is
> being considered, the more likely a misrepresentation,
> e.g., that no change is under consideration, will pass
> the threshold of materiality.

Id.

In the current case, as in any case where the misrepresentation in question is the statement that no change in benefits is under consideration, the only factor at issue is the degree of seriousness with which the change was in fact being considered.  This factor controls the materiality test:  "[T]he more seriously a plan change is being considered, the more likely a misrepresentation . . . will pass the threshold of materiality."  Id.  Serious consideration forms the crux of the inquiry.  See Kurz v. Philadelphia Elec. Co., 994 F.2d 136, 140 (3d Cir.) ("Kurz I") ("PECo is entitled to argue . . . that the statements it allegedly made were not material because at the time those statements were made, the amendment to the plan was not under serious consideration"), cert. denied, 510 U.S. 1020 (1993); Berlin v. Michigan Bell Tel. Co., 858 F.2d 1154, 1163-64 (6th Cir. 1988) ("when serious consideration was given to implementing [improved benefits, the company] had a fiduciary duty not to make misrepresentations, either negligently or intentionally, to potential plan participants concerning the [change]"); see also Maez v. Mountain States Tel. & Tel., Inc., 54 F.3d 1488, 1501 (10th Cir. 1995) (holding allegation of company's denial of early retirement plan when plan was under serious consideration sufficient to state claim for breach of fiduciary duty); Mullins v. Pfizer, Inc., 23 F.3d 663, 669 (2d Cir. 1994) (same, following Fischer I); cf. Vartanian v. Monsanto Co., 14 F.3d 697, 702 (1st Cir. 1994) (holding plaintiff had standing to assert claim for company's misrepresentations when retirement plan was under serious consideration); Barnes v. Lacy, 927 F.2d 539, 544 (11th Cir.) (noting that if a company "after serious consideration of a second [plan]" represented that no change was being considered, "such a representation would be characterized as a material misrepresentation"), cert. denied,

502 U.S. 938 (1991).

Although the test we set out in Fischer I ultimately turned on "serious consideration," we paid little attention to the details of that term. We offered nothing in the way of a definition, standard, or even factors to consider. We simply remanded the case to the district court, leaving to the district judge the task of determining when PECo's consideration became serious. We commend his efforts to apply this amorphous concept. We will now provide further guidance on the meaning of "serious consideration."

The concept of "serious consideration" recognizes and moderates the tension between an employee's right to information and an employer's need to operate on a day-to-day basis. Every business must develop strategies, gather information, evaluate options, and make decisions. Full disclosure of each step in this process is a practical impossibility. Moreover, as counsel for PECo emphasized at oral argument, large corporations regularly review their benefit packages as part of an on-going process of cost-monitoring and personnel management. The various levels of management are constantly considering changes in corporate benefit plans. A corporation could not function if ERISA required complete disclosure of every facet of these on-going activities. Consequently, our holding in Fischer Irequires disclosure only when a change in benefits comes under serious consideration.

Equally importantly, serious consideration protects employees. Every employee has a need for material information on which that employee can rely in making employment decisions. Too low a standard could result in an avalanche of notices and disclosures. For employees at a company like PECo, which regularly reviews its benefits plans, truly material information could easily be missed if the flow of information was too great. The warning that a change in benefits was under serious consideration would become meaningless if cried too often.

We demonstrated our awareness of these competing policies in Fischer I. Although our decision was clearly driven by an employee's need for truthful information, we nevertheless recognized a concomitant "right [of] an employer to make the business decision of how much and when to enhance pension benefits." 994 F.2d at 133. Later in the opinion, we expressed similar sentiments, cautioning that

> ERISA does not impose a duty of clairvoyance on fiduciaries. An ERISA fiduciary is under no obligation to offer precise predictions about future changes to its plan. Rather, its obligation is to answer participants' questions forthrightly, a duty that does not require the fiduciary to disclose its internal deliberations nor interfere with the substantive aspects of the collective bargaining process.

Id. at 135 (citations omitted). Other courts of appeals have likewise emphasized the absence of any "duty of clairvoyance," as well as the fact that disclosure does not extend to internal deliberations. See Swinney v. General Motors Corp., 46 F.3d 512, 520 (6th Cir. 1995); Mullins, 23 F.3d at 669; Drennan v. General

Motors Corp., 977 F.2d 246, 251 (6th Cir. 1992), cert. denied, 508 U.S. 940 (1993); Barnes 927 F.2d at 544; Berlin, 858 F.2d at 1164.

In light of these concerns, we believe that the following formulation of serious consideration is appropriate: Serious consideration of a change in plan benefits exists when (1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change. We draw this formulation primarily from the excellent opinions of Judge Weiner in the current case, seeDistrict Ct. Op. at 17, and Judge Katz in Zschunke v. Bell Atlantic Corp., 872 F. Supp. 1395, 1401 (E.D. Pa. 1995), aff'd, 70 F.3d 1259 (3d Cir. 1995). Consistent with our decision in Fischer I's companion case, this formulation does not turn on any single factor; the determination is inherently fact-specific. Kurz I, 994 F.2d at 139. Likewise, the factors themselves are not isolated criteria; the three interact and coalesce to form a composite picture of serious consideration. For purposes of discussion, we address each in turn.

The first element, a specific proposal, distinguishes serious consideration from the antecedent steps of gathering information, developing strategies, and analyzing options. A company must necessarily go through these preliminary steps before its deliberations can reach the serious stage. This factor does not mean, however, that the proposal must describe the plan in its final form. A specific proposal can contain several alternatives, and the plan as finally implemented may differ somewhat from the proposal. What is required, consistent with the overall test, is a specific proposal that is sufficiently concrete to support consideration by senior management for the purpose of implementation.

The second element, discussion for implementation, further distinguishes serious consideration from the preliminary steps of gathering data and formulating strategy. It also protects the ability of senior management to take a role in the early phases of the process without automatically triggering a duty of disclosure. This factor recognizes that a corporate executive can order an analysis of benefits alternatives or commission a comparative study without seriously considering implementing a change in benefits. Preliminary stages may also require interaction among upper level management, company personnel, and outside consultants. These discussions are properly assigned to the preliminary stages of company deliberations. Consideration becomes serious when the subject turns to the practicalities of implementation.

The final element, consideration by senior management with the authority to implement the change, ensures that the analysis of serious consideration focuses on the proper actors within the corporate hierarchy. As noted, large corporate entities conduct regular or on-going reviews of their benefit packages in their ordinary course of business. These entities employ individuals, including middle and upper-level management employees, to gather information and conduct reviews. The periodic review process may also entail contacting outside

consultants or commissioning studies.  During the course of their employment, the employees assigned these tasks necessarily discuss their duties and the results of their studies.  These discussions may include issues of implementation.  The employees may also make recommendations to upper level management or senior executives.  As a general rule, such operations will not constitute serious consideration.  These activities are merely the ordinary duties of the employees.  Until senior management addresses the issue, the company has not yet seriously considered a change.

Consideration by senior management is also limited to those executives who possess the authority to implement the proposed change.  This focus on authority can be used to identify the proper cadre of senior management, but it should not limit serious consideration to deliberations by a quorum of the Board of Directors, typically the only corporate body that in a literal sense has the power to implement changes in benefits packages.  It is sufficient for this factor that the plan be considered by those members of senior management with responsibility for the benefits area of the business, and who ultimately will make recommendations to the Board regarding benefits operations.

At the risk of redundancy, we stress that these factors do not establish a bright-line rule.  In Kurz I, we expressly rejected the suggestion that serious consideration could be tied to any single objective event.  994 F.2d at 139.  Our decision today, which merely elaborates on Fischer I and Kurz I, contrasts markedly with a true bright-line rule, such as that recently adopted by the Court of Appeals for the Second Circuit.  ComparePocchia v. NYNEX Corp., 81 F.3d 275, 278 (2d Cir. 1996) (adopting bright-line rule where employee fails to request information about changes in benefits, finding no duty to disclose changes until new plan goes into effect), with Mullins v. Pfizer, Inc., 23 F.3d 663, 668-69 (2d Cir. 1994) (following Fischer I and adopting materiality standard for affirmative misrepresentations).  The elements that we have outlined limit serious consideration to the latter stages of corporate decision-making, but they remain flexible and fact-specific.

We believe that our explanation of serious consideration maintains the balance struck in Fischer I.  Our formulation respects the division of responsibility in corporate entities and the day-to-day realities of running a business.  Even more importantly, it protects the right of employees to material information.  Characterizing serious consideration in this fashion ensures that disclosures to employees about potential changes in benefits will be meaningful.  Employees will learn of potential changes when the company's deliberations have reached a level where an employee should reasonably factor the potential change into an employment decision.  This guarantees that employees will have the information they need, while avoiding a surfeit of meaningless disclosures.  Finally, as a matter of policy, we note that imposing liability too quickly for failure to disclose a potential early retirement plan could harm employees by deterring employers from resorting to such plans.  See Pocchia, 81 F.3d at 279 ("If fiduciaries were required to

disclose such a business strategy, it would necessarily fail. Employees simply would not leave if they were informed that improved benefits were planned if workforce reductions were insufficient."); cf. Swinney, 46 F.3d at 520 ("Changing circumstances, such as the need to reduce labor costs, might require an employer to sweeten its severance package, and an employer should not be forever deterred from giving its employees a better deal merely because it did not clearly indicate to a previous employee that a better deal might one day be proposed."). Our formulation avoids forcing companies into layoffs, the primary alternative to retirement inducements. This further protects the interests of workers.

### III.

Having explained our understanding of serious consideration, we now apply it to the case at bar. Although we would ordinarily remand to allow the district court to apply our standard in the first instance, we see no need in the current case. Judge Weiner's thoughtful opinion has set out clearly the necessary factual findings, and we can simply apply the law to reach the requisite conclusion. Based on our three factor test, we find that serious consideration began on April 7, 1990. We will therefore reverse the district court to the extent that it found serious consideration as of March 12, 1990.

The district court correctly dismissed events prior to March 12, 1990, as failing to rise to the level of serious consideration. Any potential consideration of an early retirement program prior to June, 1988, was conclusively ended by Paquette's decision to forego an early retirement option and focus on operational excellence. These events had no bearing on the subsequent decision to implement an early retirement plan in August, 1990.

The district court was equally correct to dispose of Paquette's statements during his speeches to employees on December 13, 1989. Paquette responded truthfully to employee questions regarding PECo's potential responses to an adverse decision in the rates case. Paquette explained that PECo would first appeal the decision but might also have to consider cutting costs by reducing its stock dividend or other methods. This is the type of frank response to employee concerns that should be encouraged. Paquette's statements will not support an inference that an early retirement plan was then under serious consideration.

The district court then concluded that PECo began seriously considering a plan sometime between December and April. Citing Lefkowitz's March 12, 1990, telephone call to TPF&C as the earliest example of affirmative action to implement the plan, the district court marked the start of serious consideration on that date. Under our three factor inquiry, this is incorrect.

As we have explained, serious consideration requires (1) a specific proposal (2) discussed for purposes of implementation (3) by senior management with the authority to implement the change. In the case at bar, these three factors did not coincide until April 7, 1990, when senior PECo management met to discuss the TPF&C report on staff reduction options. The

TPF&C report is an excellent example of a specific proposal. This document outlined various early retirement alternatives and served as the basis for management's deliberations. Senior management was present at the meeting. The subject of the meeting was corporate strategy, and meeting notes indicate that Paquette disclosed his intent to announce $100 million in cost cuts. Both facts suggest that an early retirement plan was discussed for purposes of implementation at the April 7 meeting.

Events prior to April 7, by contrast, do not rise to the level of serious consideration. The March 12 Lefkowitz telephone call is clearly insufficient. First, the substance of the March 12 call involved nothing more than a general discussion of early retirement options. Lefkowitz was reestablishing contact on a subject where TPF&C had done no work since 1988. The subject matter of the contact was therefore preliminary. Second, Lefkowitz was a middle management employee in PECo's benefits department. His official duties entailed monitoring PECo's benefits package and exploring potential changes. Nothing in the record indicates that, when Lefkowitz made his March 12 telephone call to TPF&C, he was doing anything more than acting within the scope of his normal duties. This type of action by a middle management employee is preliminary. Third, even if Lefkowitz were acting on orders from senior management, his call to TPF&C would still fall under the rubric of gathering information. Senior management is free to start the process of exploration and evaluation without immediately triggering a duty of disclosure. For each of these reasons, the March 12 phone call took place prior to serious consideration. The district court was therefore incorrect.

The March 20 contact between Lefkowitz and TPF&C confirms this conclusion. It was on March 20 that Lefkowitz asked TPF&C to develop a set of options for staff reduction, including various early retirement plans. This is crucial. Serious consideration can only begin after information is gathered and options developed. The record indicates that the March 20 phone call assigned TPF&C the task of developing options. This contact therefore preceded serious consideration.

Events between March 20 and April 7 can similarly be categorized under preliminary stages such as information gathering and strategy formulation. The record indicates that Murdoch, a partner at TPF&C, met with Lefkowitz and other PECo executives during this period. These meetings are consistent with TPF&C's efforts to develop a report for PECo, the very task it had been assigned on March 20. The fact that TPF&C submitted its report on April 2 removes any lingering doubt. It was only after April 2 that a specific proposal existed.

Given that TPF&C submitted its report on April 2, the meetings that occurred on April 2, 5, and 6 between Murdoch, Paquette, and other PECo management present a closer question. A proposal had been developed and PECo management was involved in the meetings. However, details of the proposals were still being discussed. On April 7, a corporate strategy meeting was held. Paquette stated at the meeting that he would announce targets and programs on April 20. Based on this clear example of a meeting

of senior PECo executives to address the early retirement issue at a time when a specific proposal had been submitted, we conclude that serious consideration began on April 7, 1990.

Under the rule established in Fischer I, any employee who asked about a potential early retirement plan after serious consideration began on April 7, 1990, but before the plan's formal announcement on April 19, 1990, received material misinformation. Such an employee would have established a claim for breach of fiduciary duty under ERISA. However, all of the members of the plaintiff class retired before this period. We will, therefore, enter judgment for PECo on the plaintiff's breach of fiduciary duty claim.

IV.

The plaintiff class raised two alternative theories of liability which we will discuss briefly. Neither has merit.

First, the plaintiff class proceeded on an alternative theory of common law estoppel. To establish a claim for equitable estoppel under ERISA, a plaintiff must prove: (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances. Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226, 235 (3d Cir. 1994). We need look no further than the first element. Because no change in the plan was under serious consideration at the time the members of the plaintiff class requested information, no material representations were made. The estoppel claim fails.

Second, the plaintiffs argue that PECo engaged in conduct violative of ERISA § 510, 29 U.S.C. § 1140. Section 510 provides:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled . . . or for the purpose of interfering with the attainment of any right to which such participants may become entitled . . . .. It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter . . ..

29 U.S.C. § 1140. To recover under this provision, an employee must show "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." Gavalik v. Continental Can Co., 812 F.2d 834, 852 (3d Cir.), cert. denied, 484 U.S. 979 (1987); see also Berger v. Edgewater Steel Co., 911 F.2d 911, 922 (3d Cir. 1990), cert. denied, 499 U.S. 920 (1991). None of these elements are present in the current case.

Nothing in the record suggests that PECo engaged in prohibited employer conduct. PECo attempted none of the actions listed in § 510 as giving rise to a discrimination claim. None of the employees were "discharge[d], fine[d], suspend[ed], expel[led], [or] discipline[d]." They were simply allowed to retire when they wished. Nor were the class members

"discriminate[d] against."  PECo treated the class members no differently from any other workers.  It announced the early retirement program to all employees at the same time after the April 7 meeting of senior management.  As a result, the plaintiff class has failed to make out a claim under § 510.

In addition, under the law of this circuit, suits for discrimination under § 510 are "limited to actions affecting the employer-employee relationship," not mere changes in the level of benefits.  Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan, 24 F.3d 1491, 1503 (3d Cir. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1099 (1995).  PECo's early retirement offer only changed the benefit level of its pension plan; the plan did not alter PECo's relationship with its retirees.

Finally, nothing in the record indicates that PECo had the requisite intent for a discriminatory violation.  To recover under § 510, a plaintiff must show that the defendant had a specific intent to violate ERISA.  "Proof of incidental loss of benefits as a result of a termination will not constitute a violation of § 510."  812 F.2d at 851 (citations omitted).

For each of these reasons, the plaintiff class has failed to make out a claim for discrimination under ERISA § 510.  As noted, the plaintiff class has also failed to make out a claim for common law estoppel.  We will reverse the holding of the district court on both counts.

### V.

Under the rule in Fischer I, PECo's liability turns on the point at which serious consideration began.  Applying our understanding of serious consideration, we find that serious consideration began on April 7, 1990.  Because all the members of the plaintiff class retired before this date, none were provided with material misinformation.  The class's alternative theories of recovery likewise fail.  We will reverse the holding of the district court and enter judgment for the defendant.