Nancy WAYNE; Mary Ann Acaldo; Barbara Garvin; Karen Kendrick; Doris Ryan; Carol Jane Tidwell, Plaintiffs–Appellants,

v.

PACIFIC BELL, a corporation; Pacific Telesis Group, Defendants–Appellees.

No. 97–56546.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 13, 1999.

Decided Aug. 30, 1999.

A. Kendall Wood, Marc S. Schechter, and Courtney A. Barnes, Hinchy, Witte, Wood, Anderson & Hodges, San Diego, California, for the plaintiffs-appellants.

R. Bart Kimball, Jonathan L. Daniel, and William E. Matsumura, Pacific Telesis Legal Department, Los Angeles, California, for the defendants-appellees.

Before: DOROTHY W. NELSON, FERNANDEZ, and FLETCHER, Circuit Judges.

Opinion by Judge FLETCHER, Partial Concurrence and Partial Dissent by Judge FERNANDEZ

FLETCHER, Circuit Judge:

Plaintiffs are six former Pacific Bell employees who claim their employer induced them to retire under an early retirement incentive program by failing to disclose that it was seriously considering offering a more favorable program. Plaintiffs appeal from the district court's order granting summary judgment for defendants Pacific Bell and Pacific Telesis Group (collectively "Pacific")[1] on their claim for equitable re-

---

1. This memorandum follows the practice of the parties and treats Pacific Bell and its

lief for breach of fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"). We have jurisdiction under 28 U.S.C. § 1291, and we reverse.

We recently held in *Bins v. Exxon Company, U.S.A.,* 189 F.3d 929 (9th Cir.1999), that once an employer-fiduciary gives serious consideration to a proposal to change ERISA benefits, it has an affirmative duty to disclose information about the proposal to all plan participants and beneficiaries to whom the employer knows, or has reason to know, the information is material. Applying that rule here, we hold that Pacific had an affirmative duty to disclose such information, at the latest, when it offered plaintiffs' union an enhanced early retirement program during collective bargaining.

## I

Pacific was plaintiffs' employer and a fiduciary of the ERISA pension plan (the "Plan") in which plaintiffs participated. According to plaintiffs, Pacific misrepresented the Plan's financial stability, required plaintiffs to accept or reject an Early Retirement Incentive program (the "ERI II") during June, 1995, and failed to disclose during that month that it was seriously considering a proposal to implement a more favorable Early Retirement Benefit program (the "ERB").

On approximately June 1, 1995, Pacific announced the ERI II, a 4 + 4 early retirement incentive program. The ERI II provided an incentive to retire by adding four years to a person's age and four years to the actual number of years of service for purposes of determining eligibility, thereby enabling a younger person with less experience to retire early without a penalty in the amount of pension benefits. Pacific required plaintiffs to accept or reject the ERI II offering during a one-month window between June 1 and June 30, 1995. Employees who agreed to retire under the ERI II were required to retire on July 15, 1995. Plaintiffs each signed an Election and Agreement to Retire under the ERI II ("Agreement"). The Agreement did not permit plaintiffs to revoke their decisions to retire after June 30, 1995, the last day of the election period.

Pacific and plaintiffs' union, the Communications Workers of America (the "Union"), negotiated a new collective bargaining agreement every three years. Pacific and the Union had agreed to the terms of the ERI II as part of the August 1992 Collective Bargaining Agreement (the "1992 CBA"). Until August 5, 1995, the termination date of the 1992 CBA, Pacific was permitted to offer only early retirement incentive programs included in the 1992 CBA, such as the ERI II. Plaintiffs contend that, beginning in approximately December, 1994, and continuing through June, 1995, Pacific misrepresented the Plan's financial status and the likelihood that Pacific would offer an enhanced benefit program under the upcoming August 1995 Collective Bargaining Agreement (the "1995 CBA").[2]

During that time period, plaintiffs received mass voice-mail messages at work identifying senior managers who had been laid off, explaining that the marketing department needed people in other units to sell Pacific Bell services to neighbors and friends, and telling employees to save money on office supplies. Paulette Rennie, a first-level manager, told plaintiff Nancy Wayne that Pacific's financial prospects looked "gloomy." In May, 1995, second-

---

parent holding company Pacific Telesis Group as one entity. Neither defendant disputes that it is a Plan fiduciary.

**2.** In *Bins,* we held that an employer-fiduciary has an affirmative duty of disclosure once it seriously considers implementing a change in benefits. *See Bins,* 189 F.3d at 929. Once that affirmative duty is triggered, the court need not consider whether the employer also made misrepresentations, for the failure to disclose material information to plan participants and beneficiaries is itself a breach of the employer's fiduciary duty under ERISA.

level managers Mike Lynch and Jim Ostrich held a floor meeting in plaintiffs' section and told them that the company was in a bad state financially and that they anticipated Pacific would lose 30 percent of its business customers once competition in the industry took effect. Lynch and Ostrich explained that for the first time in history shareholders might not receive dividends on their stock and that Pacific was going to have to cut 10,000 employees in five years.

At a June 1, 1995, meeting informing plaintiffs of the ERI II offer, management representatives stated in response to employee questions that "no additional monies would be available to make another early retirement offer." Plaintiff Mary Ann Acaldo recalls attending a meeting at which Pacific representatives, including Diane Raynor, the Pacific human resources manager responsible for disseminating information about the ERI II, answered employee questions about the ERI II. According to Acaldo, one of the people running that meeting stated that no retirement offers with enhanced benefits would be forthcoming.

During this period, plaintiff Acaldo was told by her supervisor that her job might be in danger. At some point after the ERI II offer, Acaldo stopped second-level manager Mike Lynch in the hall. She told him she had heard rumors that a better early retirement offer might be made in the future, and she asked whether he thought that might be possible. Lynch responded "Mary Ann, you're the smart one. All these other people are waiting for a bonus or for extra money. There is never going to be any money. This company can't afford to pay any money." Acaldo told all of the other plaintiffs what Lynch had said to her. Plaintiff Karen Kendrick asked her supervisor whether any better offers were going to be made and was told she "shouldn't count on it." Plaintiff Doris Ryan's manager told her she was eligible for the ERI II and suggested it would be a good idea to take the offer. Ryan concluded from this, and from her sense of Pacific's financial situation, that she had no choice but to take the offer because otherwise she would be "gone with nothing."

A June 6, 1995, in-house newsletter included a "State of the Business" column with responses by Pacific's executive vice president to employee questions about downsizing.[3] In that column, the executive vice president explained that it was "too early to tell" what cost-saving measures would be implemented in addition to workforce reduction and that "the next two or three years [would] be very challenging." The column also included the following question and answer:

Q *We have heard rumors of another early out, comments?*

A. This is questionable due to two factors, the declining surplus in the pension fund and the dilemma of incenting [sic] good people to leave. Last years [sic] decision to utilize involuntary management force adjustment plan will stand.

The executive vice president's answer thus contained an implicit threat that employees who did not accept the current "early out" ran the risk of being subjected to the "involuntary management force adjustment plan"—i.e., in plain English, ran the risk of being fired. Plaintiffs also understood the newsletter to mean that the surplus in the pension fund was drying up and that there would not be enough money in the fund in the future to offer early retirement incentives more favorable than the ERI II. In truth, however, Pacific's actuarial services group had concluded that the pension fund would be overfunded by 1.6 billion dollars by the year 2000 if Pacific did nothing to deplete the surplus.

Between late 1994 and early 1995, Pacific's labor relations committee had already developed an internal proposal to offer an

---

**3.** Pacific asserted at oral argument that the newsletter was distributed by an employee and not by Pacific. While the origin of the newsletter may be disputed, Pacific does not dispute that such statements were made to employees by Pacific management.

enhanced early retirement program. That proposal was submitted to a high-level steering committee to prepare for the 1995 collective bargaining sessions with plaintiffs' Union. Pacific and the Union began formal collective bargaining for the 1995 CBA on June 13, 1995.

On June 15, the Union submitted Union Proposal No. 28, which noted that the Plan was "very healthy" and "greatly overfunded," and proposed a new 6 + 6 early retirement incentive with a cash incentive of one year's pay and additional financial benefits (the "6 + 6 proposal"). On June 16, Pacific introduced a Cash Balance Pension proposal. Unlike an early retirement program such as the ERI II or the Union's 6 + 6 proposal, the Cash Balance Pension proposal would have amended the Plan to allow Pacific to lay off employees rather than requiring it to keep earlier job security commitments. Under the Cash Balance Pension proposal, an employee not yet at retirement age would have been entitled to "cash out" the balance accrued toward his or her pension rather than leaving Pacific with no pension benefits at all. The Union rejected this proposal.

On June 19, Pacific proposed a "Downsizing Program," which included an enhanced 4 + 4 early retirement benefit program that included 20 percent supplemental payments through age 62 (the "proposed ERB" or "ERB proposal"). The proposed ERB also included an option to cash out the 20 percent supplemental payments, in effect providing an up-front cash incentive. The terms of the Union's 6 + 6 proposal and of Pacific's ERB proposal were both more favorable to employees considering retirement than the terms of the existing ERI II.

Pacific and the Union ultimately agreed to amend the Plan by creating a new ERB

consisting of a 4 + 4 early retirement program with a 30 percent supplement (an increase from the 20 percent supplement in Pacific's initial ERB proposal). Compared to the ERI II, the new ERB contained an approximate increase of 13 to 14 percent in pension benefits and 30 percent supplemental payments through age 62, with an option to cash out the supplemental payments. On August 8, 1995, Pacific and the Union formally agreed to the 1995 CBA, which included the new ERB.

In October, Pacific offered the new ERB to employees in plaintiffs' former work group.[4] Had plaintiffs retired under the new ERB offered to their work group in October instead of under the ERI II, they would each have been entitled to additional pension benefits with cash values ranging from $26,962.74 to $99,241.38.

Plaintiffs sued Pacific in federal court, seeking relief for alleged breach of fiduciary duty under ERISA, see 29 U.S.C. §§ 1104 and 1132(a)(2) & (3), benefits due under ERISA, see 29 U.S.C. § 1132(a)(1)(B), and declaratory relief.[5] Pacific moved for summary judgment. The district court found that Pacific had "advertised that its financial health was poor, that downsizing was inevitable, and that the surplus in the pension plan was drying up." The district court also concluded that plaintiffs had asked their supervisors whether better early retirement incentives would be offered in the future, but that their supervisors had told them there would be no better offers. Nevertheless, the district court held Pacific had not affirmatively misled the employees in order to induce them to retire earlier, and that the undisputed facts established that plaintiffs were told only that there was no guarantee of a better offer.

---

4. It is not clear from the record before us whether Pacific and the Union later negotiated a modified version of the new ERB and offered that negotiated ERB to plaintiffs' work group. In any event, it is undisputed that both the new ERB and the "negotiated ERB" (if one existed) provided enhanced benefits as compared to the ERI II. For ease of reference, we will refer to the ERB offered to plaintiffs' work group simply as the new ERB.

5. Plaintiffs originally asserted several state law claims in addition to their ERISA claims. Plaintiffs have dismissed those state law claims pursuant to stipulation.

■ The district court held that Pacific had a duty to disclose material information to plaintiffs once plans to implement improved benefits were under "serious consideration," but the court concluded that Pacific's serious consideration could not take place until collective bargaining resulted in a binding agreement with the Union. In addition, the district court held that Pacific was not permitted to communicate with individual employees about potential terms of a future early retirement program because such communications would have interfered with the Union's role as the employees' exclusive bargaining agent. Accordingly, the district court granted summary judgment for Pacific. We review de novo a decision granting summary judgment. *See Williams v. Caterpillar, Inc.,* 944 F.2d 658, 661 (9th Cir. 1991).

## II

■ Pacific does not dispute that it is an ERISA fiduciary under the Plan. As noted above, we recently held that when an employer-fiduciary gives serious consideration to a proposal to change retirement benefits, it has an affirmative duty to disclose information about the proposal to plan participants and beneficiaries to whom the employer knows, or has reason to know, the information is material. *See Bins,* 189 F.3d 929. Pacific knew that plaintiffs had agreed to accept the ERI II and that the last day for plaintiffs to revoke their acceptance was June 30, 1995. It also knew that the likely future of plan benefits was material to each plaintiff's decision whether to retire under the ERI II. Thus, if Pacific seriously considered a proposal to change benefits prior to June 30, it had an affirmative duty to provide plaintiffs with straightforward and accurate information about that proposal. *See id.*

■ To determine when an employer has seriously considered changing ERISA benefits, we use the framework established by the Third Circuit in *Fischer v. Philadelphia Electric Co.,* 96 F.3d 1533 (3d Cir. 1996) ("*Fischer II*"), as adopted and explained in our decision in *Bins. See Bins,* 189 F.3d at 933. Under that test, serious consideration takes place when "(1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change." *Bins,* 189 F.3d at 935. Under *Fischer II* and *Bins,* the three parts of the test are not isolated criteria but related elements that must be analyzed together in an "inherently fact-specific" review. *Bins,* 189 F.3d at 935.

■ We hold that serious consideration took place, at the latest, on June 19, 1995, when Pacific presented its proposed ERB to the Union in the collective bargaining session. At that point, the proposal had been prepared by Pacific's labor relations team, had been reviewed by a high-level steering committee, and had been offered to the Union by a Pacific representative with authority to bind Pacific to its terms. Pacific contends the proposed ERB was not being discussed "for purposes of implementation" because it had not yet been accepted by the Union. We disagree and hold that offering a specific proposal in collective bargaining constitutes "discussion for purposes of implementation" of such a proposal under *Fischer II* and *Bins.*

The district court thus erred in accepting Pacific's argument that it did not seriously consider a change in benefits until it signed a new collective bargaining agreement with the Union. Addressing a similar argument in *Drennan v. General Motors Corp.,* 977 F.2d 246 (6th Cir.1992), the Sixth Circuit held that during a period of collective bargaining General Motors ("GM") had seriously considered changing eligibility for a particular separation benefits plan. *See id.* at 251–52. The court rejected GM's argument that because it could not change separation benefits without the union's approval it had no fiduciary duty to disclose information about the proposed change. *See id.* at 252. The Sixth Circuit concluded that information about

the proposed change was material to the interests of employees who were deciding whether to accept the terms of another GM separation plan for which they were already eligible. *See id.* As the *Drennan* court put it, "[I]t was GM's serious consideration of the plan, rather than the union's approval of the plan, that triggered its fiduciary duties." *Id.* Consequently, GM had a fiduciary duty to provide participants straightforward and accurate information about the proposed change despite the fact that collective bargaining had not yet been concluded. *See id.*[6]

The *Drennan* rule is directly applicable here. Pacific presented the ERB proposal to the Union on June 19, 1995, eleven days before the last day on which plaintiffs could decline the ERI II offering. Whether the Union accepted the ERB proposal was immaterial to the question of whether Pacific was giving it "serious consideration" under *Fischer II* and *Bins*. Once it made that proposal, at the latest, Pacific was obligated in its role as an ERISA fiduciary to provide plan participants with information about the possibility of favorable changes in the Plan. Just as an employer is free to engage in business activities without violating its fiduciary duties under ERISA, an employer is free to assert its business interests in collective bargaining. But the fact that an employer-fiduciary has no obligation to bargain in its employees' interests, *see Lea v. Republic Airlines, Inc.*, 903 F.2d 624, 631 (9th Cir. 1990), does not mean that it is free during a period of collective bargaining to withhold information from plan participants in violation of its fiduciary duty under ERISA.

■ We do not believe that ERISA's disclosure requirement conflicts with an employer's obligation not to bargain with individual employees. *See generally* 29 U.S.C. § 159(a) (providing that designated bargaining representatives shall be exclusive employee representatives for purposes of collective bargaining). Pacific relies on *National Labor Relations Board v. Baltimore News American Division*, 590 F.2d 554 (4th Cir.1979), in which the Fourth Circuit held that an employer is not entitled to offer enhanced retirement and pension benefits to individual employees unilaterally without the approval of their bargaining agent. *See id.* at 556. In *Baltimore News*, however, the employer offered the enhanced early retirement program directly to individual employees after reaching a bargaining impasse with the union over the proposed change. *See id.* at 555. Attempting as an employer to undermine a union's power to bargain on behalf of its members is a far cry from communicating as a fiduciary about serious consideration of a proposal to change employee benefits under an ERISA plan. *See Adamczyk v. Lever Bros. Co.*, 33 F.Supp.2d 679, 687 (N.D.Ill.1998) (rejecting application of *Baltimore News* where plaintiffs represented by union claimed employer had failed to inform them that it was seriously considering enhanced benefits package).

■ We believe that the affirmative duty to communicate articulated in *Bins* will not substantially interfere with the collective bargaining process. As we stated in *Bins*, "[t]he employer-fiduciary need only (1) inform those employees to whom the information may be useful that senior management is seriously considering changing benefits, and (2) generally describe the proposed changes and explain what categories of plan participants and beneficiaries might be affected." *Bins*, 189 F.3d at 939. This approach comports with the Third Circuit's statement in *Fischer II* that an ERISA fiduciary's duty "to answer participants' questions forth-

---

**6.** In *Drennan,* the court focused on the fact that GM had made material misrepresentations in response to employee inquiry about a possible change in benefits. 977 F.2d at 250–51. In light of our decision in *Bins* that an employer-fiduciary has an affirmative duty to disclose information to plan participants and beneficiaries to whom it knows the information is material, we need not consider plaintiffs' contention that Pacific Bell misrepresented the likely future of plan benefits in response to employee inquiry.

rightly ... does not require the fiduciary to ... interfere with the substantive aspects of collective bargaining." 96 F.3d at 1539. Here, for example, both the employer and the union had proposed retirement programs that were more favorable to employees than the existing program, and disclosing the likelihood of improved retirement benefits to potentially affected employees would not have interfered with negotiations and would have helped potentially affected employees make informed decisions.

Providing employees with information relevant to their decisions about pension benefits does not interfere with bargaining unless the employer attempts to use those communications to undermine a union's position in bargaining. Collective bargaining often goes on for a sustained period before an agreement is reached, and an employer's duties as an ERISA fiduciary are not suspended during that period. Indeed, a contrary rule would produce perverse incentives, for if an employer's fiduciary duties were suspended during collective bargaining, the employer might be tempted to extend the bargaining period solely in order to avoid its fiduciary obligations.

Once Pacific seriously considered the ERB proposal, information about that proposal was material to each plaintiff's decision whether to accept the ERI II. Pacific knew plaintiffs were planning to retire, and it therefore had an affirmative duty to provide them with straightforward and accurate information about the existence and nature of the ERB proposal. *See Bins,* 189 F.3d at 929. In choosing not to provide that information, Pacific violated its fiduciary duty to plaintiffs under ERISA.

We therefore **REVERSE** and **REMAND** for further proceedings consistent with this opinion.

FERNANDEZ, Circuit Judge, concurring and dissenting:

I concur in the majority opinion's reversal of the summary judgment in this case. However, I dissent from that opinion to the extent that it relies upon the flawed decision in *Bins v. Exxon Co.,* 189 F.3d 929 (9th Cir.1999). The reasons for my disagreement are set forth in my dissenting opinion in that case. *See Bins,* 189 F.3d at 941–43 (Fernandez, J. dissenting).

That is to say, as I see it there is evidence that questions about possible amendments were not properly answered, even after those amendments were under serious consideration by the company. *See Fischer v. Philadelphia Elec. Co.,* 96 F.3d 1533, 1539–40 (3rd Cir.1996). Moreover, there is evidence of actual mendacity, and that itself precludes summary judgment. *See Ballone v. Eastman Kodak Co.,* 109 F.3d 117, 124–26 (2nd Cir.1997); *Drennan v. General Motors Corp.,* 977 F.2d 246, 251–52 (6th Cir.1992).

Therefore, I do concur in the remand, but respectfully dissent from the direction that the district court apply the *Bins* theory in deciding this case on remand.