Ernest S. BINS, Plaintiff–Appellant,

v.

**EXXON COMPANY U.S.A., a division of Exxon Corp., Defendant–Appellee.**

No. 98–55662.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 13, 1999.

Decided Aug. 30, 1999.

Thomas G. Moukawsher, Moukawsher & Walsh, Groton, Connecticut, for plaintiff-appellant.

James Severson, Heather C. Beatty, Allyson W. Sonenshine, McCutchen, Doyle, Brown & Enersen, Los Angeles, California, and David M. Rivet, Exxon Company, U.S.A., Houston, Texas, for defendant-appellee.

Before: D.W. NELSON, FERNANDEZ, and W. FLETCHER, Circuit Judges.

Opinion by Judge W. FLETCHER; Partial Concurrence and Partial Dissent by Judge FERNANDEZ.

W. FLETCHER, Circuit Judge:

Appellant Ernest Bins worked for Exxon, U.S.A. ("EUSA"), a division of Exxon Corporation ("Exxon"), for fifteen years. In the months before he retired, Bins unsuccessfully attempted to confirm rumors that EUSA was considering offering eligible employees a lump-sum retirement incentive under an existing employee benefit plan covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. Two weeks after Bins retired, EUSA announced precisely the sort of retirement incentive about which Bins had inquired. We must decide whether EUSA, as an ERISA fiduciary, had a duty to tell Bins that it was seriously considering a proposal to offer eligible employees such an incentive. We conclude that once EUSA began serious consideration of a proposal to offer more advantageous severance benefits, information about that proposal was material to the retirement decisions of employees, like Bins, who would be eligible for such benefits if the proposal were approved. We

further conclude that EUSA had an affirmative duty to disclose information about the proposal to Bins as soon as EUSA knew or should have known that such information was material to his decision about when to retire.

## I

Ernest Bins worked for EUSA as a Senior Mechanical Technician on an offshore oil drilling rig. He became eligible for retirement in the summer of 1995 and decided to retire effective January 1, 1996. In the fall of 1995, Bins began hearing rumors that, in addition to regular retirement benefits, EUSA would offer a lump-sum retirement incentive under its Special Program of Severance Allowances ("SPOSA"). The SPOSA is an ERISA benefit plan established by Exxon that permits it to pay special severance benefits to employees if and when it decides to offer special inducements to retire as a means of reducing its workforce.

Anxious to confirm rumors of an impending SPOSA offering, Bins asked everyone available to him who might have been able to provide information about such an offering. He asked his supervisors, Mechanical Foreman Kelly Pease and Field Superintendent Jerry Odom, who told him that, although they knew nothing about a SPOSA offering, they had heard the same rumors. Bins also asked his assigned benefits counselor, Becky Pilgrim, and a human resources advisor, Ray Julson. According to Bins, these were the people to whom he had been instructed to direct his benefits questions. They also told him they knew nothing about a SPOSA offering.

Bins decided to postpone his retirement to February 1, 1996, in part because of rumors about the new SPOSA offering and in part because he wanted to avoid a penalty for early withdrawal from his Thrift Account. In November, 1995, Bins attended a retirement seminar conducted by Lea Connor, an Exxon attorney. At the seminar, Connor answered another prospective retiree's question by stating that she had no knowledge of a new SPOSA offering. At Bins' retirement party on his last day of work, December 27, 1995, Bins asked his supervisor's supervisor, Dave Lucas, whether EUSA was going to offer SPOSA benefits. Lucas replied that he had no knowledge of such an offering.

From December 27, 1995 until his retirement on February 1, 1996, Bins used accrued vacation time to supplement his scheduled off-duty days and did not return to work. Bins could have changed his retirement date at any time prior to February 1, 1996. After December 27, however, he did not ask again about the possibility of a SPOSA offering, and no one told him about the likelihood of a change in benefits.

Meanwhile, in the fall of 1995, EUSA initiated an Organization Effectiveness Study Team ("OES Team") to increase efficiency in the Production Department where Bins was employed. In December 1995 and January 1996, the OES Team submitted proposals to EUSA's senior management to reorganize the Production Department (creating a 200–person labor surplus) and to offer increased benefits under the SPOSA to induce early retirement of excess workers. EUSA Vice-President J.H. Peery reviewed both proposals on November 29, 1995. As manager of the affected department, Mr. Peery was authorized to implement the SPOSA offering after obtaining approval from Exxon. EUSA Senior Vice-President M.E. Foster reviewed the two proposals on December 1, 1995. EUSA President Ansel Condray first reviewed the proposals on December 15, 1995.

The record before us does not reveal when EUSA forwarded the proposals to Exxon, but we know that on January 11, 1996, Exxon Senior Vice-President Harry Longwell favorably reviewed the reorganization proposal. We also know that EUSA President Ansel Condray conducted a final review of both proposals on Janu-

ary 24, 1996. On January 26, Exxon Senior Vice–President Robert Wilhelm wrote a brief letter formally approving the proposed reorganization. On January 30, EUSA Human Resources Manager M.A. Beg requested approval to implement the proposed SPOSA from Exxon Vice–President of Human Resources, D.S. Sanders. Sanders approved the SPOSA offering on February 2, and Beg received the approval on February 5, 1996.

On January 24, 1996, while Exxon was reviewing the reorganization proposal, EUSA Human Resources Operations Manager, Butch Snow, sent members of the EUSA Human Resources Department a confidential memorandum entitled "How to Respond to Questions Regarding SPOSA" and an attachment entitled "How Questions Regarding SPOSA Should Be Addressed/Legal Guidance/Organization Effectiveness Study Implementation." The memorandum and attachment provided a list of "acceptable responses" to questions from employees and their supervisors about the possibility of a new SPOSA offering.

Human resources personnel were instructed to say in response to employee inquiries: "The study is still under review. I don't know of a SPOSA having been approved." The Snow memorandum explained that if a supervisor asked whether he or she could discuss the possibility of SPOSA benefits with an employee who intended to retire as of February 1, human resources personnel should tell the supervisor not to initiate any SPOSA-related discussion with employees. Even if a supervisor knew the SPOSA offering had received final approval, supervisors were supposed to respond to questions by saying "[a]n announcement is scheduled for (*insert portion of the month* )." The memorandum explained that to prevent supervisors from learning about SPOSA approval "it is expected that any knowledge of SPOSA approval, if such approval is ever given, will be tightly held." It instructed human resources personnel that they should use the list of "acceptable responses" both to determine appropriate responses to questions and to advise local site managers and "natural leadership team members" about how to respond to SPOSA inquiries.

On February 13, 1996, less than two weeks after Bins retired, EUSA publicly announced the reorganization plan and the availability of SPOSA benefits. Bins filed suit, contending EUSA had breached its duties as an ERISA fiduciary. Relying on *Fischer v. Philadelphia Elec. Co.*, 96 F.3d 1533, 1539–41 (3d Cir.1996) ("*Fischer II* "), Bins argued that once EUSA began "seriously considering" a proposal to offer enhanced benefits under the ERISA severance plan, it had not only a duty to respond accurately and straightforwardly to Bins' questions, but also an affirmative duty to provide information even in the absence of specific questions.

■ EUSA moved for summary judgment. The district court applied *Fischer II*, but concluded that EUSA was not "seriously considering" a proposal to offer SPOSA benefits as of December 27, 1995, the last time Bins asked EUSA officials about the possibility of a SPOSA offering. The district court held that EUSA was seriously considering a proposal to offer SPOSA benefits before Bins retired, but concluded that because Bins had not specifically renewed his inquiry about SPOSA benefits, EUSA had no affirmative duty to disclose that it was considering such a proposal. Finding no breach of fiduciary duty under ERISA, the district court granted summary judgment for EUSA. We have jurisdiction under 28 U.S.C. § 1291. We review de novo a decision granting summary judgment, *see Williams v. Caterpillar, Inc.*, 944 F.2d 658, 661 (9th Cir.1991), and we reverse.

## II

■ Congress enacted ERISA to protect participants and beneficiaries of employee benefit plans by creating a statutory system that would encourage employers to offer benefit plans, establish "standards

of conduct, responsibility, and obligation for fiduciaries," and provide plan participants and beneficiaries with "appropriate remedies ... and ready access to the Federal courts." *See Varity Corp. v. Howe,* 516 U.S. 489, 497, 513, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (quoting ERISA § 2(b), 29 U.S.C. § 1001(b)). In enacting ERISA, Congress painted with a broad brush, expecting the federal courts to develop a "federal common law of rights and obligations" interpreting ERISA's fiduciary standards. *Id.* at 497, 116 S.Ct. 1065 (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110–11, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (internal quotation omitted)).

We must determine in this case the scope of fiduciary duties under ERISA when an employer-fiduciary considers a proposal to offer more generous severance benefits under an existing ERISA plan. We hold that information about a potential change in benefits is material to plan participants and beneficiaries when the employer begins serious consideration of such a change. We further hold that once an employer-fiduciary seriously considers a proposal to offer changed benefits under an existing ERISA plan, the employer-fiduciary has an affirmative duty to disclose information about the proposed changes to plan participants and beneficiaries whom it knows or should know are considering retirement and to whom the information would therefore be useful. This affirmative duty of disclosure arises whether or not plan participants or benefi-

ciaries have asked the employer-fiduciary for the information.

## A. *ERISA's Fiduciary Duty of Loyalty*

It is well-established that the "act of amending a pension plan does not trigger ERISA's fiduciary provisions." *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, ——, 119 S.Ct. 755, 760, 142 L.Ed.2d 881 (1999) (quoting *Lockheed Corp. v. Spink,* 517 U.S. 882, 891, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996)). That is, an employer does not act in its fiduciary capacity as a plan administrator when it makes a business decision to amend a plan. *See Cunha v. Ward Foods, Inc.,* 804 F.2d 1418, 1432–33 (9th Cir.1986).[1] Nevertheless, an employer's obligations as an ERISA fiduciary are not suspended while it considers a proposal to amend an existing ERISA plan or to adopt a replacement plan. The core obligation of an ERISA fiduciary is to "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).[2] Looking to the common law of trusts for guidance, the Supreme Court concluded in *Varity* that providing information about likely future plan benefits falls within ERISA's statutory definition of a fiduciary act. *See Varity,* 516 U.S. at 502–03, 116 S.Ct. 1065.

Conveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be an exercise of a power "appropriate" to carrying out an impor-

---

1. Of course, an employer may not amend an ERISA plan in a manner that would interfere with vested rights under the plan. *See Hughes Aircraft,* 525 U.S. at ——, 119 S.Ct. at 760–62, 142 L.Ed.2d 881 (discussing ERISA's vesting requirements); *Spink,* 517 U.S. at 892 n. 5, 116 S.Ct. 1783. This case does not involve vested benefits.

2. ERISA § 404(a)(1) provides in pertinent part:

**(a) Prudent man standard of care**

(1) ... a fiduciary shall discharge his duties with respect to a plan solely in the in-

terest of the participants and beneficiaries and-
(A) for the exclusive purpose of:
(i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the plan;
(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims[.]
29 U.S.C. § 1104(a)(1).

tant plan purpose. After all, ERISA itself specifically requires administrators to give beneficiaries certain information about the plan. *See, e.g.,* ERISA §§ 102, 104(b)(1), 105(a). And administrators, as part of their administrative responsibilities, frequently offer beneficiaries more than the minimum information that the statute requires-for example, answering beneficiaries' questions about the meaning of the terms of a plan so that those beneficiaries can more easily obtain the plan's benefits. To offer beneficiaries detailed plan information in order to help them decide whether to remain with the plan is essentially the same kind of plan-related activity.

*Id.* (citing Restatement (Second) of Agency, § 229(1) (1957)).

### B. *Serious Consideration*

■ Several of our sister circuits have adopted standards for determining when the likelihood that an employer will amend an ERISA plan to offer an enhanced retirement incentive or severance program is sufficiently substantial to require an employer-fiduciary to communicate accurately and straightforwardly with plan participants and beneficiaries about the proposed amendment. The leading case is *Fischer II,* which requires that an employer-fiduciary communicate the substance of a potential change in benefits as soon as it gives "serious consideration" to a proposal. 96 F.3d at 1538–40. Serious consideration takes place when "(1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change." *Id.* at 1539. *Fischer II* treats the three parts not as isolated criteria but as related elements that must be analyzed together in an "inherently fact-specific" review to determine when the employer first seriously considered implementing a proposed change in benefits. *id.*

*Fischer II* provides a lengthy explication of the purpose of the test and the meaning of each element:

The concept of "serious consideration" recognizes and moderates the tension between an employee's right to information and an employer's need to operate on a day-to-day basis.... Too low a [materiality] standard result in an avalanche of notices and disclosures.... The warning that a change in benefits was under serious consideration would become meaningless if cried too often.
. . .

The first element, a specific proposal, distinguishes serious consideration from the antecedent steps of gathering information, developing strategies, and analyzing options. A company must necessarily go through these preliminary steps before its deliberations can reach the serious stage. This factor does not mean, however, that the proposal must describe the plan in its final form. A specific proposal can contain several alternatives, and the plan as finally implemented may differ somewhat from the proposal. What is required, consistent with the overall test, is a specific proposal that is sufficiently concrete to support consideration by senior management for the purpose of implementation.

The second element, discussion for implementation, ... recognizes that a corporate executive can order an analysis of benefits alternatives or commission a comparative study without seriously considering implementing a change in benefits. Preliminary stages may also require interaction among upper level management, company personnel, and outside consultants.... Consideration becomes serious when the subject turns to the practicalities of implementation.

The final element, consideration by senior management with authority to implement the change, ensures that the analysis of serious consideration focuses on the proper actors within the corporate hierarchy.... [L]arge corporate entities conduct regular or on-going reviews of their benefit packages in their ordinary course of business.... [T]he employees assigned these tasks necessarily discuss their duties and the re-

sults of their studies. These discussions may include issues of implementation. The employees may also make recommendations to upper level management or senior executives. As a general rule, such operations will not constitute serious consideration.... Until senior management addresses the issue, the company has not yet seriously considered a change.

Consideration by senior management is also limited to those executives who possess the authority to implement the proposed change. This focus on authority can be used to identify the proper cadre of senior management, but it should not limit serious consideration to deliberations by a quorum of the Board of Directors, typically the only corporate body that in a literal sense has the power to implement changes in benefits packages. It is sufficient for this factor that the plan be considered by those members of senior management with responsibility for the benefits area of the business, and who ultimately will make recommendations to the Board regarding benefits operations.

*Id.* at 1539–40.

While we agree that the *Fischer II* test accurately describes when information about a proposed change in benefits becomes material, we disagree with one aspect of *Fischer II*'s explication. To the extent that *Fischer II* characterizes the "serious consideration" test as a compromise between an employer's role as a fiduciary in administering an ERISA plan and its role as a business in seeking to maximize returns for its owners, we disagree. In our view, there is no such thing as an appropriate compromise between these two roles. The employer, when acting as a fiduciary, has an undivided duty of loyalty to the participants and beneficiaries of the plan. The employer's need to operate efficiently as a business should play no role in determining when the employer has an obligation to communicate with employees about a proposed change in benefits.

We believe that this view of the fiduciary's duty is compelled by the Supreme Court's decision in *Varity*, where the Court focused on ERISA's requirement that a fiduciary " 'discharge his duties with respect to a plan *solely* in the interest of the participants and beneficiaries.' " *Varity*, 516 U.S. at 506, 116 S.Ct. 1065 (quoting 29 U.S.C. § 1104(a)) (emphasis added). The Court held that making intentional misrepresentations about the future of plan benefits is an act of plan administration, explaining that "[t]o participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act 'solely in the interest of the participants and beneficiaries.' " *Id.* (quoting 29 U.S.C. § 1104(a)(1)).

Under the *Fischer II* test, a potential change in benefits becomes sufficiently likely—and therefore becomes sufficiently material to plan participants and beneficiaries to trigger the fiduciary duty—when the employer-fiduciary seriously considers a proposal to change plan benefits. Most of our sister circuits have adopted *Fischer II* or some closely related variation. The Tenth Circuit has adopted the *Fischer II* serious consideration test without modification. *See Hockett v. Sun Co., Inc. (R & M)*, 109 F.3d 1515, 1522–24 (10th Cir.1997). The First Circuit applies a modified version of the serious consideration test, making explicit the requirement that the specific proposal under consideration would apply to a person in plaintiff's position. *See Vartanian v. Monsanto Co.*, 131 F.3d 264, 272 (1st Cir.1997). In addition, the First Circuit emphasizes the flexibility of the *Fischer II* test, noting that the ultimate issue is whether it appears from the totality of the circumstances that an enhanced benefit package is being seriously considered, i.e. whether " 'a composite picture of serious consideration' has developed." *Id.* (quoting *Fischer II*, 96 F.3d at 1539). We agree with the First Circuit that the flexibility inherent in the *Fischer II* test is essential, particularly in cases that present evidence of an employer's

"deliberate attempt to circumvent ERISA" by carefully patterning its conduct so as to evade one of the three factors. *id.*

In *Ballone v. Eastman Kodak Co.*, 109 F.3d 117 (2d Cir.1997), the Second Circuit declined to treat serious consideration as a "talismanic" indicator. *Id.* at 122. Under the Second Circuit test, whether changes to a plan are being seriously considered is "but one factor in the materiality inquiry." *Id.* at 123. Other factors include the extent to which employees had other reliable information about proposed changes in benefits and the extent to which the employer's statement misrepresented the status of internal deliberations regarding future changes. *See id.* at 125. In addition, external factors—such as a downturn in the company's business fortunes or an imminent need for participants to make a choice about benefits—may shift the balance toward a finding that information is material. At root, the inquiry must be "about the special relationship of trust and confidence between the plan fiduciary and beneficiary." *Id.*[3]

Under the formulation employed by the Sixth Circuit, serious consideration occurs when a company "focuses on a particular plan for a particular purpose." *See McAuley v. Int'l Bus. Mach. Corp., Inc.*, 165 F.3d 1038, 1043 (6th Cir.1999) (quoting *Muse v. Int'l Bus. Mach. Corp.*, 103 F.3d 490, 494 (6th Cir.1996), *cert. denied,* 520 U.S. 1240, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997)), *petition for cert. filed,* 67 U.S.L.W. 3758, 1999 WL 386719 (U.S.

June 7, 1999) (No. 98–1961).[4] In *McAuley,* the Sixth Circuit applied its "focus" test in conjunction with the serious consideration test elaborated in *Fischer II. Id.* As the Sixth Circuit implicitly recognized, these tests simply provide two different ways of articulating the point at which an employer is sufficiently focused on or serious about a proposed change in ERISA benefits that information about the proposal is material to employees planning to retire.

The serious consideration test is a useful starting point for assessing materiality. Indeed, in many cases, applying the serious consideration test will resolve a case without further inquiry. Granting talismanic significance to the elements of that test, or to the test as whole, however, can in some cases distract attention from the question whether the employer has fulfilled its duty. As the First Circuit's discussion in *Vartanian* suggests, any formulaic test risks narrowing the fiduciary duty by giving the benefit of the doubt to employers who comply with the words of the test but do not comply in spirit with their fiduciary obligations under ERISA. 131 F.3d at 272. The core inquiry must always be whether the employer has violated its duty of loyalty to plan participants by failing to disclose material information, making misleading statements, or otherwise putting its business goals ahead of its fiduciary obligations.

---

**3.** The factual circumstances in *Ballone* demonstrate the risk of adopting a rigid interpretation of the three-factor test prescribed in *Fischer II.* In *Ballone,* Kodak had allegedly revised the pension plan and then encouraged employees to retire by assuring them that Kodak had *ruled out* further plan changes for the immediate future. *See id.* at 120–21. The following year, however, Kodak reviewed its situation and authorized more generous benefits under the re-revised pension plan. *See id.* at 125–26. Thus, Kodak had not seriously considered offering a revised plan at the time it represented to employees that it had ruled out such a change, but time proved Kodak's statement to have been a misrepresentation. The Second Circuit found the district court

had erred in granting judgment for Kodak, and that plaintiffs had adequately alleged that Kodak had assured them that it had ruled out plan changes when in fact it had not. *See id.* at 120. The *Ballone* court explained that "[w]here an ERISA fiduciary makes guarantees regarding future benefits that misrepresent present facts, the misrepresentations are material if they would induce a reasonable person to rely upon them." *Id.* at 122.

**4.** The Sixth Circuit had originated the concept of "serious consideration" as a trigger point for ERISA's fiduciary duty in *Berlin v. Michigan Bell Tel. Co.*, 858 F.2d 1154, 1163–64 (6th Cir.1988).

## C. Affirmative Duty of Disclosure

In other circumstances, we have stated that "[an ERISA] fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, even when a beneficiary has not specifically asked for the information." *Barker v. American Mobil Power Corp.*, 64 F.3d 1397, 1403 (9th Cir.1995) (holding fiduciary breached duty of loyalty by failing to inform plan participants of his suspicions concerning mismanagement of plan funds); *accord Farr v. U.S. West Communications, Inc.*, 151 F.3d 908, 914 (9th Cir. 1998), *as amended*, 179 F.3d 1252 (9th Cir.1999) (quoting *Barker* and holding employer breached fiduciary duty by withholding information about potential negative tax consequences of accepting early retirement incentive); *Bixler v. Central Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1300 (3d Cir.1993) ("This duty to inform ... entails not only a negative duty not to misinform, but also an affirmative duty to inform when the [fiduciary] knows that silence might be harmful.").[5] The related question before us today is whether an ERISA fiduciary has an affirmative obligation to provide information concerning a proposed amendment to an ERISA plan.

Our sister circuits are split over whether an ERISA fiduciary has an affirmative duty to disclose a proposed change in benefits. *See Vartanian*, 131 F.3d at 268 n. 4 (1st Cir.1997) (noting split in the circuits and declining to address affirmative duty question); *Hockett*, 109 F.3d at 1525 n. 4 (10th Cir.1997) (reserving question whether serious consideration gives rise to general duty to disclose); *McAuley*, 165 F.3d at 1043 (6th Cir.1999) (stating in dicta that ERISA fiduciary has duty to inform beneficiary of new and relevant information as it arises and to advise beneficiary of circumstances that threaten interests relevant to the ERISA relationship).[6] The Second and Fourth Circuits have concluded that employers have no affirmative duty to disclose potential plan changes in the absence of employee inquiry. *See Pocchia v. NYNEX Corp.*, 81 F.3d 275, 278 (2d Cir.1996) (citing *Stanton v. Gulf Oil Corp.*, 792 F.2d 432, 435 (4th Cir.1986), and holding fiduciary not required to disclose changes in benefit plan before changes are adopted). The Eighth Circuit appears to agree, although there is ambiguity in its position. In *Anderson v. Resolution Trust*

**5.** We have recognized that the affirmative duty under 29 U.S.C. § 1104(a) is limited by conflicting provisions of ERISA. *See Acosta v. Pacific Enterprises*, 950 F.2d 611, 618–19 (9th Cir.1991) ("[C]ommon law trust duties regarding the disclosure of information to beneficiaries may be read into ERISA through section 404(a) only to the extent that they relate to the provision of benefits or the defrayment of expenses, and only insofar as they do not contradict or supplant the existing reporting and disclosure provisions. Thus, an ERISA fiduciary has an affirmative duty to inform beneficiaries of circumstances that threaten the funding of benefits and to provide an individual faced with termination of plan coverage, upon request, 'complete and correct material information on [his or her] status and options.' ") (citations omitted). We are aware of no conflicting provisions of ERISA that would undermine the affirmative duty of disclosure in this case.

**6.** The Sixth Circuit recently recognized an ERISA fiduciary's affirmative duty to inform participants and beneficiaries of the existing provisions of an ERISA plan. *See Krohn v. Huron Mem'l Hospital*, 173 F.3d 542, 548 (6th Cir.1999) (citing *Varity*, 516 U.S. at 496, 116 S.Ct. 1065). After Krohn was injured in an accident, her husband asked her employer, the defendant Hospital, about disability benefits. The Hospital provided information about short-term disability benefits but not about long-term disability benefits. As a result, Krohn failed to file a timely application for long-term benefits. *See id.* at 545–46. The Sixth Circuit held the Hospital had an affirmative duty to inform Krohn about the availability of long-term benefits, stating "we agree with the conclusion of our sister circuits that the 'duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful.' " *Id.* at 548 (quoting *Bixler*, 12 F.3d at 1300).

*Corp.,* 66 F.3d 956, 960 (8th Cir.1995), it stated that fiduciaries sometimes have a duty to disclose information, citing *Wilson v. Southwestern Bell Tel. Co.,* 55 F.3d 399, 405–06 (8th Cir.1995). *Wilson* stated, however, that a "fiduciary is not obligated to provide information" about possible future offerings. *Wilson,* 55 F.3d at 405 (citing *Berlin,* 858 F.2d at 1164).

We believe that once an ERISA fiduciary has material information relevant to a plan participant or beneficiary, it must provide that information whether or not it is asked a question. We see no reason why the duty to disclose material information straightforwardly and accurately should apply in a case involving affirmative misrepresentations about an existing or proposed plan, *see Ballone,* 109 F.3d at 124, and in a case involving a participant or beneficiary who asks about a proposed plan, *see Fischer II,* 96 F.3d at 1537, but not in a case involving a participant or beneficiary who fails to ask about a proposed plan. A rule penalizing a person who fails to ask the right question at the right time would have a number of bad consequences, not the least of which would be to penalize employees like Bins who work far from corporate or divisional headquarters and who are unlikely to have access to informal sources of information that may be available to more favorably situated employees.

An employer seriously considering a proposal to offer more generous retirement or severance benefits knows that such information is material to plan participants who are making plans to retire. A fiduciary's fundamental duty is to protect the interests of all plan participants and beneficiaries, and a blanket disclosure rule appropriately requires the employer to provide information about a potential change in ERISA benefits to all employees who might be affected by such information. In its role as a business, the employer may wish to keep such information from the employees who are about to retire, in the hope that they will retire without the lure (and the expense) of the more generous financial package. But in its role as a fiduciary, the employer is forbidden to keep that information to itself once it becomes material. At that point, there is no principled reason to require the employer to respond to questions asked by well-informed, favorably-situated, or lucky employees, but to permit the employer to remain silent as to others.

We therefore hold that once an employer-fiduciary seriously considers a proposal to implement a change in ERISA benefits, it has an affirmative duty to disclose information about the proposal to all plan participants and beneficiaries to whom the employer knows, or has reason to know, that the information is material. We believe that an affirmative duty of disclosure does not so burden employers that they will be discouraged from offering employee benefit plans, or from offering enhanced benefits under existing plans in order to reduce their workforces. *But see Pocchia,* 81 F.3d at 278–79 (stating that requirement of voluntary disclosure would unduly burden employers and impair legitimate business goals). The employer-fiduciary need only (1) inform those employees to whom the information may be useful that senior management is seriously considering changing benefits, and (2) generally describe the proposed changes and explain what categories of plan participants and beneficiaries might be affected. This rule adequately informs participants and beneficiaries of proposed changes to an ERISA plan, and it also protects a fiduciary from liability where the fiduciary could not reasonably have known that information was material to a particular plan participant. *See Stahl v. Tony's Bldg. Materials, Inc.,* 875 F.2d 1404, 1408 (9th Cir. 1989). Moreover, by explaining to participants that serious consideration of the proposal is not a guarantee that changes will or will not be made, the employer may protect itself from employees who may later contend the employer misled them by suggesting that it would adopt the proposal.

**940**

## D. *Application*

■ In assessing whether EUSA had a fiduciary duty to inform Bins of the possibility of enhanced severance benefits, we must determine whether EUSA seriously considered the proposed SPOSA offering before Bins retired. Under *Fischer II*, serious consideration takes place when "(1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change." 96 F.3d at 1539. The parties do not dispute that the proposal to offer benefits under the SPOSA plan was a specific proposal for purposes of implementation. But EUSA contends, and the district court found, that the proposal was not being discussed by senior management with authority to implement the change because EUSA management was not authorized to implement the SPOSA offering until Exxon approved it on February 2, 1996, one day after Bins retired.

■ To determine whether senior management with authority to implement a change was considering a proposal to change benefits, it is ordinarily appropriate to look to those members of senior management responsible for approving or implementing changes in benefits within the relevant division or section of a company. We hold that this is so even if a corporate division must obtain final authorization from its corporate supervisor. In such circumstances, approval from a corporate parent is analogous to approval from a Board of Directors. As *Fischer II* stated:

Consideration by senior management is also limited to those executives who possess the authority to implement the proposed change. *This focus on authority can be used to identify the proper cadre of senior management, but it should not limit serious consideration to deliberations by a quorum of the Board of Directors, typically the only corporate body that in a literal sense has the power to implement changes in benefits packages. It is sufficient for this factor that the plan be considered by those* members of senior management with responsibility for the benefits area of the business, and who ultimately will make recommendations to the Board regarding benefits operations.

*Fischer II*, 96 F.3d at 1540 (emphasis added). Similarly, when senior management of a corporate division seriously considers changing employee benefits *in that division or subsidiary,* the third element of *Fischer II* will ordinarily be satisfied. Although a corporate division may not be authorized to implement changes without approval, when senior management of a corporate division seriously considers a proposal to change benefits, a change in benefits is sufficiently likely that information about the proposal is material to employees planning to retire.

The record before us does not fully resolve when EUSA first seriously considered the SPOSA proposal. Although there may be some factual dispute on a more complete record, we think it likely, under the *Fischer II* test as we articulate it here, that serious consideration first took place during the period beginning in late November, when EUSA senior officials reviewed the linked proposals for a new SPOSA offering and a reduction in its workforce. We are certain, however, that on this record there was serious consideration by EUSA during the period between the time Bins asked his last question, on December 27, 1995, and Bins' retirement on February 1, 1996. During that period, EUSA President Ansel Condray conducted a final review of the linked proposals, Exxon Senior Vice–President Robert Wilhelm formally approved the proposed reorganization, and EUSA Human Resources Manager M.A. Beg formally requested Exxon's approval of the proposed SPOSA offering. The only question before us on this appeal is whether the district court erred in granting summary judgment for defendants. Under the principles we articulate today, and on the record before us, it is clear that summary judgment was improperly granted.

We therefore **REVERSE** and **REMAND** for further proceedings consistent with this opinion.

FERNANDEZ, Circuit Judge,
concurring and dissenting:

I agree with the majority opinion to the extent that it holds that the proper test for answering employee inquiries is the serious consideration test.[1] However, I cannot agree that we should further destabilize this area of the law by requiring employers to announce possible new plans to some or all or their employees before the plans are actually adopted. Nor do I agree with the glosses put on *Fischer II.* Thus, I concur in part and dissent in part.

Bins asserts that once the SPOSA was under serious consideration, Exxon Corp. did owe him an affirmative duty of voluntary disclosure of the SPOSA's possible adoption. If so, the duty to him was violated because his literal retirement date came six days later. However, I do not agree that the duty existed.

Bins' argument rests primarily on *Eddy v. Colonial Life Ins. Co.*, 919 F.2d 747 (D.C.Cir.1990), although he also cites a litany of other cases in support. *See Estate of Becker v. Eastman Kodak Co.*, 120 F.3d 5 (2d Cir.1997); *Jordan v. Federal Express Corp.*, 116 F.3d 1005 (3rd Cir. 1997); *Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund*, 12 F.3d 1292 (3rd Cir.1993); *Anweiler v. American Elec. Power Serv. Corp.*, 3 F.3d 986 (7th Cir.1993). He also cites two cases from this circuit, *see Farr v. U.S. West Comm., Inc.*, 151 F.3d 908 (9th Cir.1998); *Barker v. American Mobil Power Corp.*, 64 F.3d 1397 (9th Cir.1995). However, none of those cases supports the existence of an affirmative duty of voluntary disclosure in the context of the prospective adoption of a plan where the fiduciary is not responding to an inquiry from a beneficiary.

*Eddy* involved a plaintiff with AIDS who was scheduled to undergo surgery the day his insurance policy was unexpectedly terminated. The termination was because the employing company had been sold. *See* 919 F.2d at 748. Eddy called the insurance company of the new owner to see if he could continue (or convert) his existing policy because the information he was given indicated that the new employer's policy would not directly cover his surgery. *Id.* He was told that he could not continue it. That was an at least disingenuous answer because he could convert the policy. The court held that the insurance company "has a duty upon inquiry to convey to a lay beneficiary ... correct and complete material information about his status and options when a group policy is canceled...." *Id.* at 750. The court also rejected the defendant's assertion that Eddy asked only about continuation rights, not conversion rights. "Once Eddy presented his predicament, Colonial Life was required to do more than simply *not misinform*, Colonial Life also had an affirmative obligation to *inform*—to provide complete and correct material information on Eddy's status and options." *Id.* at 751. Thus, at root, *Eddy* was a case involving misinformation about existing rights under an existing plan.

Bins' other cases are in accord with the rule that even if the question framed by the beneficiary is limited, a duty of full disclosure is triggered when a beneficiary asks the fiduciary about a policy or plan. *See Becker*, 120 F.3d at 9–10 (It was a breach of fiduciary duty to fail to provide the beneficiary with complete and accurate information about retirement options when the dying beneficiary inquired about the possibility of retiring "anytime" while on disability leave and the counselor said "right," but did not explain that when on disability leave retirement was only effective the first of the following month.); *Jordan*, 116 F.3d at 1008, 1016 (A plan ad-

---

1. *See Fischer v. Philadelphia Elec. Co.* 96 F.3d 1533, 1539–40 (3rd Cir.1996) (*Fischer II*).

ministrator's furnishing of information regarding a retirement beneficiary election that did not mention that a post-retirement change of the named beneficiary was prohibited could constitute a breach of fiduciary duty because "[i]t is apparent why a participant might consider irrevocability material" and " 'circumstances known to the fiduciary can give rise to this affirmative obligation [to inform] even absent a request by the beneficiary.' " (citation omitted)); *Bixler*, 12 F.3d at 1300 ("This duty to inform is a constant thread in the relationship between beneficiary and trustee; it entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." A beneficiary's inquiries about the end of coverage triggered a duty to inform about COBRA options.); *Anweiler*, 3 F.3d at 989–92 (It was a breach of fiduciary duty when employee was asked to sign a reimbursement agreement but was not told that he did not have to sign the agreement in order to receive his long-term disability benefits.).

Our cases are to the same effect. In *Farr*, plaintiffs' action was based on defendants' failure to give information about the negative tax consequences of an adopted, existing early retirement plan. *See* 151 F.3d at 912. We first noted that the Supreme Court[2] had not reached the "question of whether ERISA imposes a duty on fiduciaries to disclose truthful information on their own initiative, or in response to employee inquiries ... [but] we have previously held that [when making disclosures] a 'fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, even when a beneficiary has not specifically asked for the information.' " *Id.* at 914 (citation omitted). As such, providing in-

complete and misleading information about the tax consequences of the retirement plan was a breach of fiduciary duty. *Id.* at 915; *see also Barker*, 64 F.3d at 1402–04 (holding that a fiduciary who suspects plan funds are being mismanaged breaches his fiduciary duty by failing to convey complete information regarding those suspicions). Again, *Farr* involved the giving of information about the effects of taking advantage of an existing plan; at most it stands for the proposition that misleading information cannot be given.

Therefore, each of the prior cases stands for the proposition that upon inquiry the fiduciary must volunteer all material information and cannot play "scope of the question" games. *See Eddy*, 919 F.2d at 750–51. To rely upon those cases begs the question before us—what information *is* material and what must be communicated in the absence of a request, and when?[3] They do not speak to a requirement of sua sponte disclosure of information about a yet-unadopted plan. In this case, no inquiry was made after the fiduciary duty to answer questions arose. Thus, no information was disclosed at all, let alone incomplete and misleading information. The duty to answer truthfully was not breached, and none of the authority cited to us holds that a fiduciary must, even without inquiry, volunteer information about an unadopted, prospective, albeit seriously considered, plan.

Indeed, the closest authorities are to the contrary. *See Pocchia v. NYNEX Corp.*, 81 F.3d 275, 278 (2d Cir.1996) ("[P]lan fiduciaries may not affirmatively mislead plan participants about changes, effective or under consideration, to employee pension benefit plans." However, "a fiduciary is not required to voluntarily

---

2. *See Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). Bins' assertion that *Varity* supports his position lacks merit because *Varity* concerned intentional misrepresentations and the Court expressly refused to decide "whether ERISA fiduciaries have any fiduciary duty to disclose truthful information on their own initiative...." *Id.* at 506, 116 S.Ct. at 1075.

3. Of course, fiduciaries may never engage in actual misrepresentation. *See Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 122–26 (2d Cir.1997); *Drennan v. General Motors Corp.*, 977 F.2d 246, 251–52 (6th Cir.1992).

disclose changes in a benefit plan before they are adopted."); *Berlin v. Michigan Bell Tel. Co.*, 858 F.2d 1154, 1164 (6th Cir.1988) ("It is also important to note what our decision does not hold.... [We] do [not] hold that defendants had any duties ... to say anything at all or to communicate with potential participants about the future availability of [the special severance plan]."); *Stanton v. Gulf Oil Corp.*, 792 F.2d 432, 435 (4th Cir.1986) ("It is not a violation of ERISA to fail to furnish information regarding amendments before these amendments are put into effect."). Moreover, sound reasons militate against creating a rule of mandatory disclosure, in the absence of inquiry, of a plan that is under serious consideration. Under a rule of that sort, it is not clear what information should be disclosed. As the court put it in *Pocchia*, 81 F.3d at 278–79:

> Until a plan is adopted, there is no plan, simply the possibility of one. Insisting on voluntary disclosure during the formulation of a plan and prior to its adoption would, we think, increase the likelihood of confusion on the part of beneficiaries and, at the same time, unduly burden management, which would be faced with continuing uncertainty as to what to disclose and when to disclose it. Moreover, any requirement of pre-adoption disclosure could impair the achievement of legitimate business goals....
>
> Permitting plan fiduciaries to keep secret their pre-adoption deliberations and discussions in no way frustrates [the purposes of ERISA]. Rather, such a bright-line rule protects the interests of the beneficiaries, who will receive information at the earliest point at which

their rights can possibly be affected, as well as the interest of fiduciaries, who will be required to provide information only at the point at which it becomes complete and accurate.

I agree with *Pocchia*. I agree that once serious consideration begins, a plan administrator may not make material misrepresentations which suggest lack of knowledge, but must answer questions honestly and fully. However, I would not hold that an administrator also has an affirmative duty to voluntarily disclose possible prospective changes in retirement plans to all, or some, employees. As I see it, that extension of the rule places fiduciaries in an unenviable position between the Scylla of misleading employees by encouraging expectations about inchoate changes that might never occur, and the Charybdis of misleading employees by discouraging expectations about inchoate changes that are ultimately adopted. In either event, the employee might feel aggrieved because he has acted or failed to act.[4] Today we move further from the policy of "encouraging the formation of employee benefits plans," *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54, 107 S.Ct. 1549, 1556, 95 L.Ed.2d 39 (1987),[5] by making that undertaking even more parlous than it was before. We have, alas, given Scylla a seventh head and increased Charybdis' capacity.

Thus, I respectfully dissent from the majority's voluntary disclosure decision, although I concur in its opinion to the extent that it adopts the *Fischer II* serious consideration test.[6]

**4.** *See, e.g., Taylor v. Peoples Natural Gas Co.*, 49 F.3d 982, 985, 987–88 (3d Cir.1995).

**5.** *See also Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1102–03 (9th Cir.1999) (Fernandez, J. dissenting).

**6.** I do not agree with the subtle, and not so subtle, accretions to that test, however. For example, the thought that *Fischer II* is merely an ingredient in some sort of indeterminate

mix, *see* maj. op. at 938–39, might give litigants and courts more flexibility, but will hardly help employers plan their affairs. Similarly, the determination that senior management can mean those who run a mere section or division of a company, even though they are not the senior management of the company itself, maj. op. at 940, may offer wonderful new vistas to those who enjoy the litigation process, but do offer drear prospects

for employers. The fact that some intrepid employers will ultimately avoid all of the new perils in the ERISA seas will not sufficiently compensate for the added transaction costs they will incur in doing so.